**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AND ITS LOCALS 1093, 558 AND 25, et al.**

v.

**NATIONAL RIGHT TO WORK LEGAL DEFENSE AND EDUCATION FOUNDATION, INC., et al., Gerald Marker et al., Appellants (three cases).**

Nos. 77–1739, 77–1766 and 77–1767.

United States Court of Appeals, District of Columbia Circuit.

Argued June 12, 1978.

Decided Nov. 17, 1978.

Rehearing Denied Feb. 27, 1979.

---

Joseph L. Rauh, Jr., Washington, D. C., with whom John Silard, Elliott C. Lichtman and Mary M. Levy, Washington, D. C., were on the brief, for the International Union, appellants in No. 77–1766 and cross-appellees in Nos. 77–1739 and 77–1767.

Whitney North Seymour, New York City, with whom Conrad K. Harper, New York City, Thomas S. Jackson, John L. Kilcullen, Washington, D. C., Rex H. Reed, Fairfax, Va., Deborah E. Lynch, New York City, Kenneth Wells Parkinson, Patricia D. Gurne, Garry Ewing and David T. Bryant, Fairfax, Va., were on the brief, for National Right to Work Legal Defense and Education Foundation, Inc. and National Right to Work Committee, appellants in No. 77–1767 and cross-appellees in Nos. 77–1739 and 77–1766.

Godfrey P. Schmidt, New York City, and Glenn H. Carlson, Washington, D. C., were on the brief for Marker, et al., appellants in No. 77–1739 and cross-appellees in Nos. 77–1766 and 77–1767.

John A. Fillion and Stephen I. Schlossberg, Detroit, Mich., also entered appearances for United Automobile Workers, appellee in No. 77–1739.

Plato E. Papps, Washington, D. C., also entered an appearance for International Association of Machinists, appellee in No. 77–1739.

Jerome Cohen also entered an appearance for United Farm Workers National Union, appellee in No. 77–1739.

Timothy J. Lynch, Washington, D. C., also entered an appearance for Sheet Metal Workers International Association, appellee in No. 77–1739.

Robert J. Connerton, Washington, D. C., also entered an appearance for Laborers' International Union of North America, appellee in No. 77–1739.

Charles V. Koons, Washington, D. C., also entered an appearance for Communications Workers of America, appellee in No. 77–1739.

James J. Cronin, Denver, Colo., also entered an appearance for Oil, Chemical and Atomic Workers Union, appellee in No. 77–1739.

J. Albert Woll and Laurence Gold, Washington, D. C., also entered appearances for AFL–CIO, appellee in No. 77–1739.

Solomon I. Hirsh, Rosemont, Ill., also entered an appearance for Brotherhood of Railway, Airline and Steamship Clerks, appellee in No. 77–1739.

Louis Sherman, Washington, D. C., also entered an appearance for International Brotherhood of Electrical Workers, appellee in No. 77–1739.

Before TAMM and MacKINNON, Circuit Judges, and HOWARD T. MARKEY,[*] Chief Judge, U. S. Court of Customs and Patent Appeals.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

This is an appeal from a decision in which the United States District Court for the District of Columbia held that the second proviso to section 101(a)(4) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 411(a)(4) (1976), is unconstitutional as applied to the litigation program of the National Right to Work Legal Defense and Education Foundation, Inc., and that section 203(b)(1) of the LMRDA, 29 U.S.C. § 433(b)(1) (1976), does not afford a private right of action. We conclude that the second proviso to section 101(a)(4) of the LMRDA, as properly construed, does not apply to the legitimate activity of a bona fide, independent legal aid association, and we remand for further proceedings. We agree with the district court that no private right of action exists for judicial enforcement of section 203(b)(1) of the LMRDA.

I

The National Right to Work Legal Defense and Education Foundation, Inc.

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

(Foundation), was established in 1968 by the Board of Directors of the National Right to Work Committee (Committee).[1] The Committee itself is a tax-exempt, non-profit organization that opposes "compulsory unionism" through various activities, including educational projects and support of "right to work" legislation.[2] The Foundation was created as a tax-exempt, non-profit corporation with the principal purpose of providing financial assistance to workers who bring lawsuits attacking features of "compulsory unionism."

"Compulsory unionism" is an aspect of union-security agreements. In the collective bargaining process, most labor organizations seek union security through agreements with employers that condition employment upon some type of "compulsory membership" in the union. *See generally* B. Taylor & F. Witney, Labor Relations Law 317–32 (2d ed. 1975). Although the Labor Management Relations Act, 1947, outlawed the closed shop, which required a worker to join a union before qualifying for a job, § 101, 61 Stat. 140, permissible forms of union security include the union shop, which requires an employee to become a union member within a specified time after being hired, and the agency shop, which requires an employee to pay a service fee to the union equivalent to union dues and initiation fees. *See Abood v. Detroit Board of Education*, 431 U.S. 209, 217 n.10, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). By permitting forms of "compulsory unionism" less onerous than the closed shop, and providing that union membership may require the payment of periodic dues and initiation fees, Congress recognized the unfairness of permitting "free riders" to share in the benefits of what the union accomplished through collective bargaining. *NLRB v. General Motors Corp.*, 373 U.S. 734, 740–43, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963); *see* National Labor Relations Act, § 8(a)(3), 29 U.S.C. § 158(a)(3) (1976).[3] At its core, compulsory unionism refers to mandatory payment by employees of union dues and initiation fees. *NLRB v. General Motors Corp.*, 373 U.S. at 742, 83 S.Ct. 1453.

Since its creation, the Foundation has supported numerous test cases brought against labor organizations by workers who attack union dues obligations.[4] The Foun-

1. Joint Appendix (J.A.) I at 23, 43.

2. *Id.* at 23, 28.
 Section 14(b) of the National Labor Relations Act, 29 U.S.C. § 164(b) (1976), permits states to enact laws prohibiting union-security agreements that require membership in a labor union as a condition of employment. Such laws are popularly known as "right to work" laws. *See generally* B. Taylor & F. Witney, Labor Relations Law 332–35 (2d ed. 1975).

3. Section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) (1976) states:
 It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

4. Between 1969 and 1974, the Foundation supplied counsel or financial support for over forty lawsuits brought by employees against unions in addition to the twenty-one other suits out-

dation has financed lawsuits, provided counsel, and filed briefs as amicus curiae. *See* Brief for Plaintiffs-Appellants at 34–38; *see also* Joint Appendix (J.A.) I at 6–14 (Second Amended Complaint). One of the suits supported by the Foundation resulted in the recent Supreme Court decision *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261, which held that a union cannot constitutionally use money paid by employees pursuant to an agency shop agreement between the union and a local governmental employer for political purposes that the employees do not wish to support and that are not germane to the union's duties as a collective bargaining representative. *Id.* at 232–37, 97 S.Ct. 1782. *See generally* Comment, *The Regulation of Union Political Activity: Majority and Minority Rights and Remedies*, 126 U.Pa.L.Rev. 386, 414–20 (1977).

## II

In May 1973, a group of national and local labor organizations (the unions)[5] sued the Foundation and the Committee in the United States District Court for the District of Columbia. In their first cause of action, the unions sought a declaratory judgment that the Foundation was violating section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4) (1976),[6] by "financing, encouraging and participating in (other than as a party) suits brought by members of labor organizations and by employees against labor organizations with funds provided by interested employers or employer associations and on their behalf." J.A. I at 18. The unions sought a permanent injunction prohibiting the Foundation from continuing these practices, and prohibiting the Committee from assisting the Foundation in

lined in the unions' complaint. J.A. I at 7–14; *id.* at 163–67; J.A. II at 375–79.

5. Appellants herein, who were plaintiffs below, are the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its Locals 1093, 558 and 25; International Association of Machinists and Aerospace Workers and its District Lodge 1578; American Federation of State, County and Municipal Employees and its District Council 77; American Federation of Teachers and its affiliate Detroit Federation of Teachers; American Federation of Television and Radio Artists, Associated Actors and Artists of America, AFL–CIO; United Farm Workers National Union, AFL–CIO; Sheet Metal Workers International Association, AFL–CIO and its Local 146; Laborers' International Union of North America, AFL–CIO and its Local 383; Communications Workers of America, AFL–CIO and its District 7 and Local 7495; Oil, Chemical and Atomic Workers International Union, AFL–CIO and its Local 3–495; American Federation of Labor-Congress of Industrial Organizations and its Committee on Political Education, New York State AFL–CIO and Pennsylvania AFL–CIO; Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, AFL–CIO and its System Board of Adjustment No. 451 and Locals 3001, 3014 and 3049; International Brotherhood of Electrical Workers, AFL–CIO and its Local 164.

Intervening in the district court in support of the National Right to Work Legal Defense and Education Foundation, Inc. (Foundation) and the National Right to Work Committee (Com-

mittee) were a number of workers involved in litigation supported by the Foundation. Those intervenors participate in this court as appellees and cross-appellants in support of the Foundation's and the Committee's position with respect to the second proviso to section 101(a)(4) of the Labor Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 411(a)(4) (1976).

6. Section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4) (1976) states:

No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided*, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further*, THAT NO INTERESTED EMPLOYER OR EMPLOYER ASSOCIATION SHALL DIRECTLY OR INDIRECTLY FINANCE, ENCOURAGE, OR PARTICIPATE IN, EXCEPT AS A PARTY, ANY SUCH ACTION, PROCEEDING, APPEARANCE, OR PETITION. (Emphasis added.)

such litigation. The unions also asked for compensatory and exemplary damages.

In their second cause of action, the unions requested a declaratory judgment that the Foundation and Committee violated section 203(b)(1) of the LMRDA, 29 U.S.C. § 433(b)(1) (1976),[7] by failing to file statements with the Secretary of Labor reporting agreements with contributing employers concerning persuasion of employees. They sought an injunction requiring the Foundation and Committee to file such reports. The unions also sought exemplary damages. J.A. I at 19–20.

The Foundation's and the Committee's motion to dismiss the unions' complaint for failure to state a cause of action was denied. *International Union, UAW v. National Right to Work Legal Defense and Education Foundation*, 366 F.Supp. 46 (D.D.C. 1974).[8] Subsequently, the Foundation and the Committee asserted a number of defenses and sought, in a counterclaim, a declaratory judgment that sections 101(a)(4) and 203(b)(1) of the LMRDA would be unconstitutional if applied to the Foundation's litigation program. J.A. I at 82–86.

During discovery proceedings in the district court, the unions requested that the Foundation and Committee disclose the names and addresses of all employers and businesses that contributed to the Foundation during 1972. *Id.* at 141. The unions also requested that the Foundation reveal contributions by companies whose officers or employees were members of the Foundation's publicly identified Advisory Council. *Id.* at 46, 144. The Foundation refused to disclose the identities of any contributors, asserting constitutional privileges against disclosure and contending that disclosure would result in reprisals against contributors. The Foundation did release the numbers of contributors who had donated particular amounts of money. *Id.* at 145–46.

In response to the unions' motion to compel discovery, the district court ordered the Foundation to identify: (1) the thirty-seven donors who contributed between $500 and $5000 in 1971; (2) thirty-seven of the 1,048 donors who contributed between $100 and $500 in 1972; and (3) the identity of the contributing companies whose officers or employees were Foundation Advisory Council members. *Id.* at 170–71; *see* Brief For Defendants-Appellees and in Support of Cross-Appeal at 4–5 n.3.[9] After the Foun-

---

**7.** Section 203(b)(1) of LMRDA, 29 U.S.C. § 433(b)(1) (1976) states:

Every person who pursuant to any agreement or arrangement with an employer undertakes activities where an object thereof is, directly or indirectly . . . to persuade employees to exercise or not to exercise, or persuade employees as to the manner of exercising, the right to organize and bargain collectively through representatives of their choosing . . . shall file within thirty days after entering into such agreement or arrangement a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing the name under which such person is engaged in doing business and the address of its principal office, and a detailed statement of the terms and conditions of such agreement or arrangement. Every such person shall file annually, with respect to each fiscal year during which payments were made as a result of such an agreement or arrangement, a report with the Secretary, signed by its president and treasurer or corresponding principal officers, containing a statement (A) of its receipts of any kind from employers on account of labor relations advice or services,

designating the sources thereof, and (B) of its disbursements of any kind, in connection with such services and the purposes thereof. In each such case such information shall be set forth in such categories as the Secretary may prescribe.

**8.** In denying the motion to dismiss, the district court held that the unions had "standing" to seek judicial enforcement of section 203(b)(1) of the LMRDA, 29 U.S.C. § 433(b)(1). *International Union, UAW v. National Right to Work Legal Defense and Educ. Found.*, 336 F.Supp. 46, 50 (D.D.C.1974). The court subsequently reversed itself on this issue. *See* text *infra* at —, ———— of 192 U.S.App.D.C., at 1146, 1153–1155 of 590 F.2d.

**9.** The order granting the motion to compel prohibited disclosure of the employer identities to the public. The order was later modified to prohibit disclosure to union officials and limit the extent of union inquiries in an identified employer's locality. J.A. II at 390–91A.

The district court denied the Foundation's motion to certify issues relating to the discovery order under 28 U.S.C. § 1292(b) (1976). J.A. II at 345; *see* J.A. I at 244–55. An appeal

dation again refused to disclose contributors' names, the district court imposed sanctions under Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure,[10] establishing "facts which, without the list of contributors, it would be unjust and unfair to require the plaintiffs to prove." J.A. II at 417; *see* text *infra* at ——–—— of 192 U.S.App.D.C., at 1146–1147 of 590 F.2d. The Foundation also refused to disclose the names and addresses of the fifty largest contributors to the Foundation in 1972 and 1973 who were not identified in the Foundation's own records as employers or businesses. J.A. I at 211; J.A. II at 533, 628. In its order of June 2, 1977, the district court established further facts under Rule 37(b)(2)(A). J.A. III at 930–31; *see* text *infra* at ——–—— of 192 U.S.App.D.C., at 1146–1147 of 590 F.2d.

Upon imposing its first Rule 37 sanctions, the district court ordered the Foundation and the Committee to show cause why summary judgment should not be entered against them on the unions' first cause of action alleging a statutory violation. *See* J.A. II at 419. Subsequently, the district court advised the parties that it would also decide the substantial constitutional question raised by the application of the statute to the Foundation's activities. J.A. III at 834, 851–52, 855–57, 878. The district court announced, in addition, that it was reconsidering its earlier decision that the unions could sue to obtain enforcement of section 203(b)(1) of the LMRDA, 29 U.S.C. § 433(b)(1) (1976). J.A. III at 860; *see* note 8 *supra*.

On June 2, 1977, the district court entered the memorandum and order now under review.[11]

### III

The district court ruled that the Foundation had violated the second proviso to section 101(a)(4), 29 U.S.C. § 411(a)(4) (1976), but that the proviso, as applied to the Foundation's activities, violated the first amendment rights of the Foundation and its contributors. The court based its finding of a statutory violation on the two Rule 37 orders entered by it as sanctions for the Foundation's failure to disclose contributor lists. J.A. III at 938. The orders determined:

(I) That a majority of the financial contributors to the defendant Foundation are employers who (1) have contracts or other relationships with some of the plaintiff unions herein; (2) are in the same lines of business in which some of the plaintiff unions herein engage in organization; (3) have union security agreements of their own whose validity or operation may be affected by suits which the defendant Foundation is supporting; (4) have contributed to the anti-union activities of the defendant Committee; and (5) have in other ways manifested their opposition to organized labor.

(II) That such employers have a concrete interest in and would be affected by the lawsuits set forth by plaintiffs in their complaint.

(III) That a majority of the defendant Foundation's funds derive from the contributions of such employers.

---

subsequently filed in this court was dismissed for lack of jurisdiction, and on March 17, 1975, a panel of this court denied the Foundation's petition for a writ of mandamus seeking review of the discovery order. *National Right to Work Legal Defense and Educ. Found. v. Richey*, 167 U.S.App.D.C. 18, 510 F.2d 1239 (per curiam), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2631, 45 L.Ed.2d 671 (1975).

**10.** Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure provides:

If a party or an officer, director, or managing agent of a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may

make such orders in regard to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order.

**11.** The district court's decision is discussed in 58 B.U.L.Rev. 296 (1978) and 16 Duq.L.Rev. 431 (1977–78). Neither appellants nor appellees attack the procedure the district court employed in granting summary judgment. *See generally* 6 Moore's Federal Practice § 56.12 (2d ed. 1976).

(IV) That the financial contributions made by such employers to the Foundation have been given by the Foundation to the plaintiffs in the lawsuits set forth in the complaint for the purposes of financing and encouraging said litigation. (V) The Foundation (aided by the Committee) has financed, encouraged, managed and participated (other than as a party) in suits instituted by employees and members of labor organizations, which challenge their financial obligations to the union which is their collective bargaining representative. In those activities, the Foundation has been acting as an agent and conduit for employers interested in promoting such suits in order to (1) promote their self-interest in restricting the permissible scope of legality of union security provisions to which they have agreed, been asked to agree, or expect to be required to agree; (2) weaken the dues resources of labor organizations with which they have or anticipate having collective bargaining or other relationships; and (3) generally establish legal limitations on union security and union political activities which enhance union strength vis-à-vis such employers. *Id.* at 938–39.[12]

The district court ruled that these facts "establish that the defendant Foundation is an 'interested employer association' within the meaning of the [second] proviso of 29 U.S.C. § 411(a)(4)." The court held that the "Foundation has also violated the same proviso by acting as a *conduit* for 'interested employers' and using their financial contributions to fund union members in litigation against their labor organizations." *Id.* at 939 (emphasis in original). Although the court ruled that the proviso absolutely prohibited the Foundation from funding litigation by union members against their unions, it also held that, under *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), "Congress may not constitutionally so restrict the first amendment rights of

the Foundation and its contributors." J.A. III at 940–41.

With respect to the reporting requirements of section 203(b)(1) of the LMRDA, 29 U.S.C. § 433(b)(1) (1976), the district court held the statute could not be enforced through a civil action brought by the unions, and that only the Secretary of Labor could enforce the statute under section 210 of the LMRDA, 29 U.S.C. § 440 (1976). J.A. III at 943.

## IV

 If the second proviso to section 101(a)(4) applied to legitimate activity of a bona fide, independent legal aid organization, we would be forced to decide a substantial constitutional question. At least since *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405, it has been recognized that the activities of such an organization are protected modes of association and expression under the first amendment. *Id.* at 428–29, 83 S.Ct. 328. The first amendment's protection in the legal aid context extends not only to the organization itself, but also to its staff, members, contributors and others who affiliate with it. *Id.; see Buckley v. Valeo*, 424 U.S. 1, 22, 24–25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Any law that adversely affects the exercise of first amendment freedoms in connection with legal aid activity must be necessary to correct a serious and substantive evil and must be precisely drawn to serve that purpose. *See UMW, District 12 v. Illinois State Bar*, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). Moreover, any law affecting such freedoms must prohibit actual, not potential evils before it may constitutionally be applied. *In re Primus*, 436 U.S. 412, 434–439, 98 S.Ct. 1893, 1906–09, 56 L.Ed.2d 417 (1978).

The unions contend that the second proviso to section 101(a)(4) serves compelling interests that justify its limitation on the

---

**12.** Although the district court's orders referred to the Foundation as "an agent and conduit for employers," the meaning of those words is unclear, as the district court appears to have discounted the unions' allegation of a conspiracy between the unions and any employers. *See* J.A. III at 851–53.

exercise of first amendment rights. Brief for Plaintiffs-Appellants at 44. First, they allege that the proviso carries out "the historic rule in federal labor law that employers shall not interfere in the relations between unions and their members." Second, the unions assert that the proviso is necessary to "assure[ ] that Section 101(a)(4) [will] remain a shield for union members, and not become a sword for employers." *Id.* at 45, 47; *see* J.A. III at 941.

▆▆▆▆ Of course, any attempt to reconcile these asserted governmental interests with the first amendment rights of a legal aid association dedicated to opposing features of compulsory unionism would have to be made in the context of the labor relations setting. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617–18, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Expression or association that would otherwise be protected may be regulated if necessary to protect substantial rights of employees or to preserve harmonious labor-management relations in the public interest. *See generally id.* However, any such regulatory effort must proceed with caution. Expression and association related to labor issues will frequently constitute political activity which lies at the core of first amendment protections. *See generally In re Primus,* 436 U.S. at 422, 426–430, 98 S.Ct. at 1900, 1902–03, 56 L.Ed.2d 417; *cf.* ABA Comm. on Professional Ethics, Opinions, No. 148 (1935) (litigation activity of those opposed to "New Deal" labor legislation was of political nature) (noted with approval in *NAACP v. Button,* 371 U.S. at 430 n.13, 440 n.19, 83 S.Ct. 328). Even economically motivated expression or association is not disqualified from protection under the first amendment. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

▆▆▆▆ It would be a difficult task indeed to reconcile, under the first amendment, the competing values and interest presented in this controversy. However, we find it unnecessary to decide the constitutional question posed. When the constitutionality of a statute is drawn into question, a court must " 'ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " *IAM v. Street,* 367 U.S. 740, 749–50, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961) (quoting *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)); *see United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). This basic principle reflects a court's duty "of not needlessly projecting delicate issues for judicial pronouncement." *United States v. Rumely,* 345 U.S. 41, 45–46, 73 S.Ct. 543, 97 L.Ed. 770 (1953). In deciding among possible interpretations of a statute, the court must select an interpretation that appears to be consistent with the statute's constitutionality. *See United States v. Thompson,* 147 U.S.App.D.C. 1, 4, 452 F.2d 1333, 1337 (1971), *cert. denied,* 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972).

The statute in question is particularly suited to judicial construction. The second proviso to section 101(a)(4) of the LMRDA, like many other of the LMRDA's provisions, reflects " 'calculated ambiguities or political compromises.' " *Hall v. Cole,* 412 U.S. 1, 11 n.17, 93 S.Ct. 1943, 1949, 36 L.Ed.2d 702 (1973) (quoting Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959,* 58 Mich.L.Rev. 819, 852 (1960)). In determining the proviso's applicability it is imperative that we seek out its "underlying rationale." *Id.*

The LMRDA was enacted in 1959 to remedy labor and management practices that harmed employees. Some union leaders had abused their positions of increasing power and had forsaken their responsibilities to the union's members. Some members of management had interfered with the exercise of employees' rights to organize. In addition, Congress was concerned that cooperation between some employers and some officials in the labor movement operated to hurt employees. *See* H.R.Rep. No.741, 86th Cong., 1st Sess. 6–7 (1959); S.Rep.No.187, 86th Cong., 1st Sess. 5–6 (1959), U.S.Code Cong. & Admin.News 1959,

p. 2318. Because of these and other "instances of breach of trust, corruption, [and] disregard of the rights of individual employees," Congress found the enactment of the LMRDA "necessary [for the] protection of the rights and interests of employees." LMRDA § 2(b), 29 U.S.C. § 401(b) (1976).

■ One of the most significant remedial provisions of the LMRDA was the bill of rights for members of labor organizations. *See* LMRDA § 101, 29 U.S.C. § 411 (1976). Included is the right of a union member to bring an action against his union and its leaders in court or before an administrative agency. LMRDA § 101(a)(4), 29 U.S.C. § 411(a)(4).[13] The right-to-sue provision was designed to give union members the tools to insure the effective and fair operation of their union as a representative institution. *See* II NLRB, Legislative History of the LMRDA at 1104–05 (1959) (remarks of Senators McClellan and Mundt); *see also Hall v. Cole*, 412 U.S. 1, 7–9 & n.12, 93 S.Ct. 1943, 36 L.Ed.2d 702. The second proviso to the right-to-sue section, which is the subject of this controversy, provides that "no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action" by a union member against the union or its officers.

■ The legislative history of the second proviso to section 101(a)(4) is sparse. The proviso was offered in the Senate as an amendment to the right-to-sue provision of the bill of rights proposed by Senator McClellan. *See* II NLRB, Legislative History of the LMRDA at 1220–21. It was designed to keep employer influence out of disputes between union members and their unions by making it "against the law, for

an employer or an employer association, directly or indirectly, to spend any money or otherwise get into that type of situation, unless it were a party." *Id.* at 1237 (remarks of Senator Kuchel).

■ The debate clearly shows that the proviso was primarily "an attempt to protect a union member who may be engaged in a dispute with the [labor] organization." *Id.* (remarks of Senator Kuchel). Congress apparently was concerned that if employers were permitted to encourage, finance, or participate in suits by their employees against unions, they would be able, through subtle coercion or otherwise, to lead union members into action contrary to the members' desires or best interests. *Cf. NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617–18, 89 S.Ct. 1918, 23 L.Ed.2d 547 (employer speech may coerce dependent employees because of "necessary tendency" of latter to pick up intended implications of former); *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964) (well-timed conferral of benefits by employers on employees may be coercive); *NLRB v. Virginia Electric & Power Co.*, 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348 (1941) (slight suggestions of employer may coerce employees who know consequences of incurring the former's displeasure); *IAM Lodge No. 35 v. NLRB*, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50 (1940) (employer interference with employee rights must be determined by all factors, often subtle, that restrain employees' free choice).[14]

Although it desired to preclude potentially harmful employer involvement in union-member suits against unions, Congress did not want to prevent union members from using money obtained from friends, banks,

---

13. *See* note 6 *supra.*

14. The unions suggest that the limitation on employer financing of suits *against* unions is a necessary corollary to the statute that bars employers from giving money *to* a union, 29 U.S.C. § 186 (1976). Brief for Plaintiffs-Appellants at 45. However, both statutes are designed primarily to protect employees. The prohibition against payments to unions is aimed at preventing corruption and bribery of union officials that would operate to the detri-

ment of employees. The prohibition against employer financing of suits against unions is aimed at preventing coercion of employees, as well as at stopping sham or harassing suits against unions. *See Walsh v. Schlecht*, 429 U.S. 401, 410–11, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977); *Arroyo v. United States*, 359 U.S. 419, 425–27, 79 S.Ct. 864, 3 L.Ed.2d 915(1959); *see also* text *supra* at —— of 192 U.S.App.D.C., 1149 of 590 F.2d; text *infra* at —— of 192 U.S.App.D.C., 1150 of 590 F.2d.

or other similar sources to finance such suits. It was this concern that resulted in the addition of the adjective "interested" to describe those employers or employer associations whose financing was to be prohibited.[15] II NLRB, Legislative History of the LMRDA at 1237. Senator Javits, who offered the "interested" language, explained it, saying "[w]e ourselves are so against antibarratry statutes that I do not want to be a party to a law which would prevent a union member from finding a friend, who happens to be an employer of people in a totally unrelated business, a bank or anything else, to loan him the money." *Id.; see also id.* at 1844 (remarks of Senator Goldwater) ("limitation [applies] only to employers who have concrete interest in the litigation because of some relationship in the union other than the mere connection with the union member bringing the suit").

In addition to protecting employees, Senator Javits and other Senators believed that the second proviso would prevent employers from using employees' rights to "bring pressure" upon unions. *Id.* at 1237. Congressman Griffin viewed the proviso's purpose as making "sure that interested employers do not take advantage of rights accorded union members by encouraging or financing harassing suits or proceedings." *Id.* at 1811. However, he warned that in construing the proviso, its purpose should be kept in mind, and it should not be construed to impose unnecessary restrictions on employers. *Id.*

 Our review of the legislative history convinces us that Congress did not intend the second proviso to section 101(a)(4) to apply to the legitimate litigation program of a bona fide, independent legal aid organization, even though the organization receives contributions from interested employers. The dangers Congress sought to prevent in prohibiting interested employer financing of union member litigation against a union are unlikely when a bona fide legal aid organization is providing fi-

nancial assistance or services in connection with the litigation. When an independent, non-profit legal aid society exists as a buffer between employers' money and employees' lawsuits, it is most improbable that employee interests in connection with litigation will be subjugated to those of any employer. *See NAACP v. Button*, 371 U.S. 415, 441–45, 83 S.Ct. 328, 9 L.Ed.2d 405. As long as legal aid activity is not controlled by interested employers or employer associations, is not undertaken at the behest of such employers, does not permit such employers to get involved in union member suits, and cannot otherwise be imputed to such employers, the danger that employees will be coerced or misled during the initiation or maintenance of lawsuits against their unions is significantly diminished.

 With respect to the fear that interested employers will use union members' rights to "bring pressure" on unions, the only pressure such employers can bring in the context of an independent legal aid program dedicated to opposing features of compulsory unionism is through contributions that make the organization's support of litigation more possible. It is doubtful that this type of "pressure" would have motivated Congress to restrict the activity of a bona fide legal aid organization. As the Supreme Court recognized in another context:

> "It is difficult for individual members of labor unions to stand up and fight those who are in charge. The latter have the treasury of the union at their command and the paid union counsel at their beck and call while the member is on his own. . . . An individual union member could not carry such a heavy financial burden. Without counsel fees the grant of federal jurisdiction is but a gesture for few union members could avail themselves of it."

*Hall v. Cole*, 412 U.S. 1, 13, 93 S.Ct. 1943, 1950, 36 L.Ed.2d 702 (quoting *Cole v. Hall*, 462 F.2d 777, 780–81 (1972), *aff'd*, 412 U.S.

---

**15.** *See Adamszewski v. Local 1487, IAM*, 496 F.2d 777, 782–83 (7th Cir.), *cert. denied*, 419 U.S. 997, 95 S.Ct. 311, 42 L.Ed.2d 271 (1974);

*see generally Farowitz v. Associated Musicians, Local 802*, 241 F.Supp. 895 (S.D.N.Y. 1965).

1, 93 S.Ct. 1943, 36 L.Ed.2d 702). We think Congress wanted to deny employers the power to cause harassing suits or otherwise to create divisions in the unions with which they had relationships. *See Adamszewski v. Local 1487, IAM,* 496 F.2d 777, 782–83 (7th Cir.), *cert. denied,* 419 U.S. 997, 95 S.Ct. 311, 42 L.Ed.2d 271 (1974). If the interested employers contributing to a legal aid organization have no control over any aspect of its litigation program, and the organization does not allow interested employers or employer associations to get involved in its legal aid activity, this is a power they do not possess.[16]

## V

For the preceding reasons, we conclude that the second proviso to section 101(a)(4) of the LMRDA does not apply to legitimate activity of a bona fide, independent legal aid organization such as we have described.

█ In granting summary judgment in this case, the district court made no findings of undisputed fact concerning whether the Foundation is a bona fide, independent legal aid organization.[17] A grant of summary judgment may be upheld, even though the district court applied an incorrect legal standard, if it is apparent on appeal that no genuine issue of fact exists under the proper legal analysis, and the losing party has had "fair 'opportunity to dispute the facts material' to the new theory." *United States v. General Motors Corp.,* 171 U.S.App.D.C. 27, 47, 518 F.2d 420,

440–41 (1975); *see Apton v. Wilson,* 165 U.S.App.D.C. 22, 33–34, 506 F.2d 83, 94–95 (1974); *see generally Dewey v. Clark,* 86 U.S.App.D.C. 137, 140–145, 180 F.2d 766, 769–74 (1950); Fed.R.Civ.P. 56(c). However, in deciding whether summary judgment is proper under the new legal standard, the appellate court must proceed cautiously. *United States v. General Motors Corp.,* 171 U.S.App.D.C. at 47–48, 518 F.2d at 440–41; *see* 10 C. Wright & A. Miller, Federal Practice and Procedure, Civil § 2716, at 439–42 (1973 & 1977 Supp.).

█ Notwithstanding the facts established by the district court's Rule 37 orders, we are not convinced on this record that no genuine issue exists concerning the nature and the activities of the Foundation as a bona fide, independent legal aid organization.[18] Because we have determined this issue is crucial to a finding of a statutory violation, further proceedings in the district court are necessary. A remand to the district court will permit further development of the record and will give the parties an opportunity to address the facts in light of the legal principles we have discussed.

In vacating the grant of summary judgment and remanding this case, we intimate no conclusion on the merits, nor do we hold that summary judgment will be inappropriate after further proceedings in the district court. However, we believe that further proceedings devoted to ascertaining the nature of the Foundation are necessary and

---

16. In the prior opinion in this case denying the Foundation's petition for a writ of mandamus, *see* note 9 *supra,* this court noted:

> We do not understand petitioners to argue that Congress may not prohibit direct financing by an interested employer through a sham or cover entity. Their argument rather must rest on their assertion that they are a neutral body, and the constitutional question they present thus cannot be decided without a determination of what type of organization the Foundation is in fact.

510 F.2d 1239, 1243. Although we do not reach the constitutional issue, legislative history convinces us that the character of the Foundation as a bona fide, independent legal aid organization is crucial to determining whether a statutory violation occurred.

17. Findings of fact are not necessary for decisions granting summary judgment. *See* Fed.R. Civ.P. 52(a).

18. Although the Rule 37 orders established facts concerning the contributors to the Foundation, the orders did not determine facts such as whether the Foundation's litigation program was controlled by interested employers, or whether it allowed employer involvement in union member suits. *See* text *supra* at —— —— of 192 U.S.App.D.C., 1146–1147 of 590 F.2d; *see also* note 12 *supra.* Only if it is determined that the Foundation is not a bona fide, independent legal aid organization engaged in legitimate activity will it be necessary to decide any other issues that may be related to violation of the statute. *See* J.A. III at 935 n.3, 937 n.6.

will result in the "thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide." *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 257, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347 (1948); *see Carter v. Stanton,* 405 U.S. 669, 671–72, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972) (per curiam).

## VI

Because further proceedings devoted to ascertaining the nature and activities of the Foundation will be necessary on remand, it is appropriate to review the validity of the Rule 37 orders already entered. We have previously described the unions' efforts to obtain the names of the Foundation's contributors and the orders entered by the district court under Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure as sanctions for the Foundation's refusal to disclose contributors' names. *See* text *supra* at 10–14. The validity of the sanctions imposed under Rule 37(b)(2)(A) depends, in the first instance, on the validity of the discovery orders on which they were based. *See generally Smith v. Schlesinger,* 168 U.S. App.D.C. 204, 209, 513 F.2d 462, 467 (1975). On this appeal, as in the district court, the Foundation argues that its contributors' names are protected from disclosure by the constitutional principles of freedom of association and privacy enunciated in *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488. The Foundation asserts that the district court correctly recognized that the principles set out in *Carey v. Hume,* 160 U.S.App.D.C. 365, 492 F.2d 631, *petition for cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974), should guide its decision, but that it applied those principles incorrectly.

 In *Carey v. Hume,* this court ruled that first amendment interests implicated by compelled disclosure by a newsman of a confidential source may sometimes be outweighed by a civil litigant's need for information in a lawsuit. *Id.* at 636, 639. *Carey* establishes at least two inquiries that must be made by a court facing a substantial claim of constitutional privilege before it

orders discovery: 1) can the information sought be discovered through alternative sources and has the party seeking disclosure made reasonable attempts to obtain the information elsewhere; and 2) does the information sought go to the heart of the lawsuit. *Id.* at 636–39; *see also Silkwood v. Kerr-McGee Corp.,* 563 F.2d 433, 437–39 (10th Cir. 1977); *Baker v. F & F Investment,* 470 F.2d 778, 783–84 (2d Cir. 1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Garland v. Torre,* 259 F.2d 545, 549–51 (2d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958).

 The Foundation has asserted a substantial claim of constitutional privilege. As the Supreme Court stated in *NAACP v. Alabama,* 357 U.S. at 462, 78 S.Ct. at 1171 "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute . . . a restraint on freedom of association . . ." The Court recognized "the vital relationship between freedom to associate and privacy in one's associations" and noted that "it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters . . . ." *Id.* at 462, 460, 78 S.Ct. at 1171. Without doubt, the association itself may assert the right of its members and contributors to withhold their connection with the association. *Id.* at 459–60, 78 S.Ct. 1163.

The district court should have given greater attention to the initial inquiry discussed above. In seeking the names of contributors the unions were embarking upon a course that they hoped would lead to information establishing the status of some contributors as interested employers vis-à-vis Foundation supported lawsuits. *See* Reply Brief for Plaintiffs-Appellants, Appendix B at 10a. The unions, however, knew of twenty-one lawsuits that they had alleged were financed through the Foundation with interested employer money. *See* J.A. I at 7–14. The Foundation also had identified the other lawsuits it had supported by union members against their unions, and had provided pleadings in those cases. *Id.* at 159, 163–67. The district

court should have determined whether the unions had attempted to seek the information they desired directly from any of the employers connected with these lawsuits, and if so, whether those efforts had been successful. In addition, the court should have inquired whether the unions had sought information from the companies whose names appeared as members of the Foundation's publicly identified Advisory Council.

█ This simply is not a case in which the unions had "no reasonable basis to know where to begin" to find the information they sought from the Foundation. Carey v. Hume, 492 F.2d at 639. The unions should have been required to attempt to seek information from other likely and reasonably accessible sources before the Foundation was compelled to disclose the names of contributors.[19]

At some point, the additional burden on a litigant in seeking out alternative sources of discovery may justify compelling disclosure of essential information from one asserting a constitutional privilege. However, it does not appear that the course of discovery we outlined would necessarily have been so burdensome that compelled disclosure by the Foundation was justified. For the reasons stated, we hold that the orders in this case entering sanctions under Rule 37(b)(2)(A), and the underlying discovery orders, should be vacated.

## VII

In their complaint, the unions sought an injunction to force the Foundation and Committee to comply with section 203(b)(1) of the LMRDA, 29 U.S.C. § 433(b)(1) (1976).[20] After ruling that the unions were entitled to maintain the action, see International Union, UAW v. National Right to Work Legal Defense and Education Foundation, 366 F.Supp. 46, 49–51, the district court reversed itself and held that section 203(b)(1) was not enforceable through private action. J.A. III at 943–44. We agree with the district court's ultimate decision.

Section 203(b)(1) of the LMRDA requires the filing of reports by:

Every person who pursuant to any agreement or arrangement with an employer undertakes activities where an object thereof is, directly or indirectly . . . to persuade employees to exercise or not to exercise, or persuade employees as to the manner of exercising, the right to organize and bargain collectively through representatives of their own choosing.

Enforcement of the reporting requirement is governed by section 210 of the LMRDA, 29 U.S.C. § 440 (1976), which states:

Whenever it shall appear that any person has violated or is about to violate any of the provisions of this subchapter [29 U.S.C. §§ 431–441], the Secretary [of Labor] may bring a civil action for such relief (including injunctions) as may be appropriate.

Thus, on its face, the LMRDA provides solely for public enforcement of section 203(b)(1) by the Secretary of Labor.[21]

---

**19.** The district court may eventually determine that the identities of some contributors to the Foundation go to the heart of establishing a statutory violation and that the unions have been unable to obtain this information from other likely and reasonably accessible sources. If these determinations are made and the district court orders disclosure of certain contributors' names, it should take steps to minimize the effect of disclosure on the first amendment rights of the Foundation and those whose names are being disclosed. It may be that a procedure for in camera disclosure would be helpful. Another alternative would be to limit disclosure to counsel for the unions with a prohibition on any further dissemination of a contributor's identity. The district court will have to decide the best way to proceed if and when it is faced with a request for a discovery order on remand.

**20.** The unions also sought exemplary damages to deter future violations. J.A. I at 20. The district court did not discuss the issue of exemplary damages, and the parties did not raise the issue on appeal; thus we do not discuss it.

**21.** In contrast, section 102 of the LMRDA, 29 U.S.C. § 412 (1976), states that "[a]ny person whose rights secured by the provisions of this subchapter [29 U.S.C. §§ 411–415] have been infringed by any violation of this subchapter

Scrutiny of the statutory language does not end the inquiry. The Supreme Court has recently stated:

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? *See, e. g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers*, 414 U.S. 453, 458, 460, 94 S.Ct. 690, 693, 694, 38 L.Ed.2d 646 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e. g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 423, 95 S.Ct. 1733, 1740, 44 L.Ed.2d 263 (1975); *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). And finally, is the cause of action one traditionally relegated to state law . . . so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).

■ Our examination of the second criteria convinces us that a cause of action in favor of the unions should not be implied. In considering the available evidence of legislative intent, we are mindful that an express statutory provision for enforcement through an injunctive proceeding at the behest of a public official ordinarily implies that no other means of enforcement was intended. *See Securities Investor Protec-*

*tion Corp. v. Barbour*, 421 U.S. 412, 418–21, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). Turning to the available evidence of legislative intent, we see that an early Senate bill introduced by Senator McClellan contained a single enforcement provision for the bill of rights provisions and the reporting and disclosure provisions of the LMRDA: enforcement of both could be sought by the Secretary of Labor or members of a labor organization acting on behalf of themselves or their organization. S. 1137, 86th Cong., 1st Sess., § 403(a) (1959); I NLRB, Legislative History of the LMRDA at 308. This bill was never reported out of committee. The Senate bill that was reported did not contain a bill of rights, but provided for enforcement of its reporting and disclosure provisions through civil action by the Secretary of Labor. S. 1555, 86th Cong., 1st Sess., § 110(c) (1959); I NLRB, Legislative History of the LMRDA at 360. When the Senate amended this bill to include a bill of rights, it provided for enforcement of its provisions by any person whose rights had been infringed. *See* II NLRB, Legislative History of the LMRDA at 1102, 1221, 1232, 1239.[22]

The House bill that was passed also provided different enforcement mechanisms for its bill of rights provisions and for its reporting and disclosure provisions. The bill of rights could be enforced by any aggrieved person, while the reporting and disclosure provisions were enforceable only through action by the Secretary of Labor. H.R. 8342, 86th Cong., 1st Sess., §§ 102, 210 (1959); II NLRB, Legislative History of the LMRDA at 1693–1702.

■ The LMRDA as enacted contained the different enforcement mechanisms as

---

may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate."

**22.** The amendment as originally proposed in the Senate provided for enforcement of the bill of rights provisions by the Secretary of Labor. The amendment was changed to specifically

provide for enforcement of the bill of rights by any persons whose rights were violated. Senator Kuchel, sponsor of the change, stated that "giving this type of right to the aggrieved employee member himself is in the interest of justice. . . ." II NLRB, Legislative History of the LMRDA at 1232 (1959); *see id.* at 1102.

developed in both the House and the Senate for the bill of rights provisions and the reporting and disclosure provisions. LMRDA §§ 102, 210, 29 U.S.C. §§ 412, 440 (1976). The particular consideration given by Congress to who should enforce the different provisions of the LMRDA [23] leads us to the conclusion that Congress quite clearly decided that only the Secretary of Labor should be able to enforce section 203(b)(1) of the Act.

In light of the evidence of legislative intent to provide for enforcement only by the Secretary of Labor, it is unnecessary to determine whether the unions are within the class of those the statute was designed to protect, an issue concerning which appellants and appellees vigorously disagree. Even if the unions are intended beneficiaries of section 203(b)(1), we have "not the slightest reason to think that" the section "imposes such burdens on the [Secretary of Labor] that Congress must either have intended [the Secretary's] efforts to be supplemented by those of [the unions] or enacted a statute incapable of achieving its purpose." *Securities Investors Protection Corp. v. Barbour*, 421 U.S. at 425, 95 S.Ct. at 1741.

Although the unions contend that the failure to imply a private cause of action will render section 203(b)(1) "an empty promise," *see Allen v. State Board of Elec-* tions, 393 U.S. 544, 557, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), we think their only true complaint lies with the Secretary of Labor concerning the applicability of section 203(b)(1) to the activities of the Foundation and the Committee.[24] As the district court pointed out, if the Secretary of Labor determines not to institute an enforcement action after requested to do so by a private party, that party may be entitled to review of the Secretary's decision. J.A. III at 943 (citing *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975)). The unions' disagreement with the Secretary over the applicability of section 203(b)(1) provides no basis, however, for implying a cause of action for enforcement of that section in their favor.

## CONCLUSION

For the foregoing reasons, we vacate the district court's order of June 2, 1977, insofar as it grants summary judgment on the first cause of action of the unions' complaint. We also vacate the Rule 37 orders entered against the Foundation and the Committee as well as the underlying discovery orders. The district court's dismissal of the second cause of action of the unions' complaint is affirmed.

*Affirmed in part; vacated in part and remanded.*

---

23. The reporting and disclosure subchapter of the LMRDA gives union members the right to sue to gain access to books, records, and accounts of labor organizations. 29 U.S.C. § 431(c) (1976). The LMRDA also contains particular enforcement provisions for other subchapters. *See* 29 U.S.C. §§ 464, 466, 481(c), 482, 483, 501(b) (1976).

24. In a letter dated November 13, 1972, the Solicitor of the Department of Labor advised the General Counsel of the International Union, UAW, as follows:

Sections 203(a)(4) and 203(b) must be read in tandem. We would not consider these sections pertinent for several reasons. We do not think contributions by employers to an organization like the National Right to Work Committee assume the status of an agreement or arrangement within the meaning of these sections. The provisions of the Act are essentially designed to disclose a covert arrangement by an employer and consultant whereby the consultant attempts to influence or persuade that employer's employees in connection with a labor dispute. There are passages in the legislative history clarifying this point (Cong.Record 19759–62, Senate, 10/2/59), followed by a discussion of section 203(d) wherein it was said that no employer or consultant reports need be filed unless the specific circumstances set forth above are present. Section 203(d) of the Act also exonerates from reporting any employer unless he was a party to an agreement or arrangement. It would appear from this language that the Act contemplates more than a mere contribution to trigger the reporting requirement. In addition, we do not believe the Act suggests a massive reporting program such as might result if all contributors to associations, or dues paying members of employer associations, were required to report.
J.A. II at 341–42.