350 F.3d 73
 LOCAL UNION NO. 38, SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, AFL-CIO, Plaintiff-Counter-Defendant-Appellant,
v.
Anthony PELELLA, Defendant-Counter-Plaintiff-Appellee.
 Docket No. 02-7939.
 United States Court of Appeals, Second Circuit.
 Argued: August 27, 2003.
 Decided November 17, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Jeffrey S. Dubin, Huntington, NY, for Appellant.
 Christopher Watkins, Chester, NY (Stephen Bergstein, Thornton, Bergstein & Ullrich, Chester, NY, of counsel), for Appellee.
 Before: MESKILL, MINER and STRAUB, Circuit Judges.
 MESKILL, Circuit Judge.
 
 
 1
 This appeal asks us to decide if section 101(a)(4) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(4), bars a union member's counterclaim that is financed by an interested employer as well as whether punitive damages are available where only nominal damages are awarded and whether attorney's fees were justified.
 
 
 2
 Plaintiff-appellant Local Union No. 38, Sheet Metal Workers' International Association, AFL-CIO (Local 38) appeals from a judgment of the United States District Court for the Southern District of New York, Yanthis, M.J., entered after a jury trial. When Local 38 commenced an action against defendant-appellee Anthony Pelella (Pelella) to collect a fine levied during the course of an earlier union proceeding, Pelella asserted a counterclaim that accused Local 38 of breach of contract and violations of his due process rights.[1] A jury found in favor of Pelella on his counterclaim and awarded him $1 in nominal damages and $25,000 in punitive damages. Thereafter, the district court awarded Pelella $30,213 in attorney's fees and $205.50 in costs.
 
 
 3
 On appeal, Local 38 contends that section 101(a)(4) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(4), bars a union member's counterclaim where that claim for relief is financed by an interested employer. Local 38 also argues that attorney's fees were not warranted, punitive damages were not available in the absence of an award of actual damages, and, in any event, the punitive damages awarded by the jury were grossly excessive.
 
 
 4
 For the reasons that follow, we conclude that section 101(a)(4) does not bar a counterclaim financed by an interested employer. We also hold that the district court did not abuse its discretion by awarding attorney's fees and that Local 38 has waived the remaining arguments. We therefore affirm.
 
 BACKGROUND
 I. Union Proceedings
 
 5
 This appeal is the byproduct of an internal union dispute. Several years ago, Pelella joined Local 38 as an apprentice member. In October 1998, Nicholas Colombo (Colombo), Local 38's Business Representative, filed charges of misconduct against Pelella. In those charges, Colombo accused his fraternal union brother of several violations of the Constitution and Ritual of the Sheet Metal Workers' International Association and Affiliated Local Unions, State, District and Provincial Councils (the Constitution). According to Colombo, Pelella (a) had accepted substandard wages and benefits for work he performed for P & P Sheet Metal, Inc. (P & P), in excess of 40 hours with the full knowledge that benefits were not being paid to Local 38, (b) had failed to obtain an overtime permit for such work, and (c) had improperly received certain benefits.
 
 
 6
 Local 38 ordered Pelella to answer the charges before its Trial Committee. On November 4, 1998, Local 38's Executive Board, sitting as a Trial Committee (Committee), held Pelella's trial. The board members found Pelella guilty on all three charges and removed him from his employment with P & P. The Committee also imposed a $4,418 fine. However, the Committee mitigated the effect of that sanction by holding the fine in abeyance; the fine would only be reinstated if, in the future, a union Executive Board found Pelella guilty of an infraction of the Constitution.
 
 
 7
 Two weeks later, the Committee submitted its decision to the membership of Local 38. They voted unanimously to accept that decision. Thereafter, Pelella appealed to both the General President and the General Executive Council (Council) of the Sheet Metal Workers' International Association. The General President affirmed the Committee's verdict. In turn, the Council upheld the determinations of the General President and the Committee. The Council did, however, modify the Committee's decision in one pertinent respect: Pelella was informed that the fine, once held in abeyance, would now be collectible in full.[2]
 
 II. Legal Proceedings
 
 8
 After Pelella failed to pay the fine, Local 38 commenced an action, pursuant to section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, in the United States District Court for the Southern District of New York to collect the unpaid penalty. Pelella responded by asserting a counterclaim that alleged due process violations and breach of contract. According to Pelella, Local 38 breached the union's Constitution and violated his rights to due process of law when the union disciplined him without following certain procedures. In a similar vein, Pelella asserted, through various affirmative defenses, that he should not be liable for a fine that was the product of procedures that failed to comport with due process and the union's Constitution.
 
 
 9
 Local 38 moved for partial summary judgment. The union argued that section 101(a)(4) of the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a)(4), barred Pelella's counterclaim because the counterclaim had been financed by an interested employer. Pelella opposed Local 38's motion on several grounds. At the outset, Pelella argued that section 101(a)(4) did not prohibit counterclaims financed by interested employers. In addition, Pelella explained that his counterclaim had not asserted the violation of any rights in contravention of the LMRDA; rather, the counterclaim was premised on violations of the Due Process Clause and breach of contract. Pelella therefore took the position that section 101(a)(4) of the LMRDA did not apply to his counterclaim. Finally, Pelella contended that the counterclaim had not been "financed" by an "interested employer" within the meaning of section 101(a)(4).
 
 
 10
 The district court did not address whether Pelella's counterclaim had been financed by an interested employer. Nor did the court examine the precise nature of Pelella's counterclaim or the bearing thereof on the application of section 101(a)(4). Instead, the court held that section 101(a)(4) did not prohibit an interested employer from financing a member's counterclaim against his union. Accordingly, the court denied Local 38's motion for partial summary judgment.
 
 
 11
 As the trial drew near, Pelella began to describe his counterclaim in a somewhat different fashion. Immediately prior to trial, he submitted proposed jury instructions that characterized his counterclaim as one brought for breach of contract and violations of his due process rights under the LMRDA.
 
 
 12
 What transpired during the two day trial that followed is far from clear. The parties have failed on appeal to introduce an adequate record of the jury instructions, evidence, and legal arguments (including objections), if any, presented during the trial. At some stage, Local 38 apparently moved, pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, for a directed verdict. The record does not reflect the exact grounds for that motion. Moreover, the jury apparently proceeded to consider both Local 38's LMRA claim as well as Pelella's breach of contract and LMRDA allegations. In other words, the jury evaluated, inter alia, whether Local 38 had violated Pelella's due process rights under section 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5).[3]
 
 
 13
 On November 27, 2001, the jury returned a verdict in favor of Pelella with respect to Local 38's LMRA claim and on his counterclaim after they found that Local 38 had breached a contract and violated Pelella's due process rights under the LMRDA. It awarded Pelella $1 in nominal damages and $25,000 in punitive damages. The punitive damages award was predicated entirely on Local 38's violation of Pelella's LMRDA rights.
 
 
 14
 After the jury returned a verdict in Pelella's favor, Local 38 renewed its motion for judgment as a matter of law in accordance with Rule 50 and also moved, in the alternative, for a new trial pursuant to Rule 59. The union argued that Pelella could not recover punitive damages in the absence of an award of actual damages and that the evidence presented at trial was insufficient to warrant punitive damages.
 
 
 15
 The district court denied both motions. The court held that a party could recover punitive damages even in the absence of actual damages. The court also found that there was sufficient evidence from which a reasonable jury could conclude that punitive damages were warranted and that the jury's verdict had been neither seriously erroneous nor a miscarriage of justice.
 
 
 16
 At the same time, the district court granted Pelella's motion for attorney's fees and costs. The court concluded that attorney's fees were justified because Pelella's victory conferred several common benefits on Local 38's members. Hence, the court awarded Pelella $30,213 in attorney's fees and $205.50 in costs.
 
 
 17
 The court issued an Amended Judgment on July 1, 2002.[4] This timely appeal followed.
 
 DISCUSSION
 I. Standard of Review
 
 18
 Local 38 appeals from the district court's denial of its motion for partial summary judgment as well as its motions for judgment as a matter of law and for a new trial. Local 38 also appeals the district court's decision to award Pelella attorney's fees and costs.
 
 
 19
 We review de novo the district court's denial of a motion for partial summary judgment, but we only undertake to do so when, as here, a final decision has rendered the case appealable. See Travelers Insurance Co. v. Carpenter, 313 F.3d 97, 102 (2d Cir.2002); S.E.C. v. Credit Bancorp, Ltd., 290 F.3d 80, 87 (2d Cir.2002). We also review de novo the denial of a motion for judgment as a matter of law under Rule 50. Wolf v. Yamin, 295 F.3d 303, 308 (2d Cir.2002). In contrast, we review for abuse of discretion the district court's denial of a motion for a new trial pursuant to Rule 59. Smith v. Carpenter, 316 F.3d 178, 183 (2d Cir.2003). The latter standard of review similarly applies when we examine a district court's decision to award attorney's fees. Union of Needletrades, Industrial and Textile Employees, AFL-CIO, CLC v. United States I.N.S., 336 F.3d 200, 203 (2d Cir.2003).
 
 
 20
 II. Interested Employers Financing Counterclaims Under The LMRDA
 
 A. Section 101(a)(4) Of The LMRDA
 
 21
 Local 38 contends that section 101(a)(4) of Title I of the LMRDA, 29 U.S.C. § 411(a)(4), bars an interested employer from financing a counterclaim brought by a union member against his union. We disagree.
 
 
 22
 Section 101(a)(4) provides, in pertinent part:
 
 
 23
 No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding ...: Provided, That any such member may be required to exhaust reasonable hearing procedures ... within such organization, before instituting legal or administrative proceedings against such organization or any officer thereof: And provided further, That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.
 
 
 24
 29 U.S.C. § 411(a)(4).
 
 
 25
 As the district court acknowledged, although the LMRDA was enacted in 1959, relatively few cases have addressed the scope of section 101(a)(4)'s second proviso. The majority of the cases that have analyzed the second proviso dealt with situations in which a union member affirmatively commenced a lawsuit against his union. See, e.g. Harris v. Plasterers and Cement Masons Local No. 406, 619 F.2d 1164, 1169-70 (7th Cir.1980); Adamszewski v. Local Lodge 1487, International Association of Machinists and Aerospace Workers, AFL-CIO, 496 F.2d 777, 780-84 (7th Cir.1974); Colapietro v. International Association of Machinists and Aerospace Workers, District 64, 611 F.Supp. 90, 94-96 (D.R.I.1985); Farowitz v. Associated Musicians of Greater New York, Local 802, A.F. of M., 241 F.Supp. 895, 908-09 (S.D.N.Y.1965). Only one decision has reviewed the second proviso's application to a counterclaim.
 
 
 26
 In International Brotherhood of Electrical Workers, Local 336 v. Illinois Bell Telephone Co., 496 F.2d 1 (7th Cir.1974), the Seventh Circuit squarely addressed the precise issue before us. There, a union initiated a lawsuit to collect fines levied against union members. Id. at 2. In response, the defendants sought to recover installment payments they had already made towards the fine by filing a counterclaim. Id. The union asserted that an interested employer had financed the counterclaim and argued that section 101(a)(4) barred the defendants' counterclaim under those circumstances.
 
 
 27
 The Seventh Circuit disagreed. On examining section 101(a)(4), the court explained that "the language Congress chose prohibits the financing of `any such action,' which refers back to the right of a member `to institute an action in any court.'" Id. at 3. The Seventh Circuit held that it could "only presume that Congress meant what it said, that an interested employer may not finance the institution of a suit by employees, but is free to finance a defense or a counterclaim." Id.
 
 
 28
 The Seventh Circuit's rationale is persuasive in light of the plain language of section 101(a)(4). When we construe a statute, we first look to the language of the statute itself so as to ascertain the provision's plain meaning, if it has one. Auburn Housing Authority v. Martinez, 277 F.3d 138, 143 (2d Cir.2002); United States v. Dauray, 215 F.3d 257, 260 (2d Cir.2000). As the Seventh Circuit noted in Illinois Bell Telephone Co., section 101(a)(4)'s second proviso precludes interested employers from financing "any such action," a phrase that refers back to and limits a member's right to "institute an action in any court." 29 U.S.C. § 411(a)(4) (emphasis added).
 
 
 29
 The word "action," without more, is arguably broad enough to encompass any type of judicial proceeding, including counterclaims. See United States v. P.F. Collier & Son Corp., 208 F.2d 936, 938 (7th Cir.1954) ("If the question were one of first impression, we would have no difficulty in reaching the conclusion that the words `any action, suit or proceeding' are sufficiently broad in their ordinary and commonly accepted meaning to encompass every form and kind of litigation."); see also Black's Law Dictionary 28-29 (7th ed.1999) (defining an "action" as, inter alia, "[a] civil or criminal judicial proceeding"). Cf. U.C.C. § 1-201(1) ("`Action' in the sense of a judicial proceeding, includes recoupment, counterclaim, set-off, suit in equity, and any other proceeding in which rights are determined.").
 
 
 30
 We need not decide, however, whether the word "action," standing alone, embraces Pelella's counterclaim for the purposes of section 101(a)(4)'s second proviso. "[T]he meaning of statutory language, plain or not, depends on context." King v. St. Vincent's Hospital, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991). In the statutory context of section 101(a)(4), the word "action" is qualified by the phrase "to institute."
 
 
 31
 A party institutes an action when he commences a judicial proceeding. See Black's Law Dictionary, supra, at 801 (defining the verb "institute" as "[t]o begin or start; commence"); see also McNeil v. United States, 508 U.S. 106, 112, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("[T]he normal interpretation of the word `institute' is synonymous with the words `begin' or `commence.'"). A party commences a judicial proceeding when he takes the first step that invokes the judicial process. See Black's Law Dictionary 183 (6th ed.1991) (defining "commence" as "[t]o initiate by performing the first act or step; [t]o begin, institute or start"); see also United States v. $8,221,877.16 in United States Currency, 330 F.3d 141, 159 (3d Cir.2003) (quoting McNeil, 508 U.S. at 112, 113 S.Ct. 1980) ("In the context of civil actions, the word `commence' does not encompass broad concepts, but rather requires `invocation of the judicial process.'").
 
 
 32
 An action is therefore instituted when a plaintiff files a complaint as that constitutes the first step invoking the judicial process. See Fed.R.Civ.P. 3 ("A civil action is commenced by filing a complaint with the court."); Fed.R.Civ.P. 3 advisory committee's note ("[T]he first step in an action is the filing of the complaint."). In sharp contrast, a defendant asserts a counterclaim in response to a plaintiff's institution of an action. A counterclaim, by definition, is a "claim for relief asserted against an opposing party after an original claim has been made." Black's Law Dictionary 353 (7th ed.1999) (emphasis added); see also 3 James Wm. Moore, et al., Moore's Federal Practice § 13.90[2][a], at 13-79 (3d ed. 1997) ("Only defending parties may assert counterclaims."). Counterclaims are therefore "generally asserted in the answer" to a previously filed complaint. Moore, supra, § 13.92, at 13-88.
 
 
 33
 In other words, a defendant does not "institute" an action when he asserts a counterclaim. Rather, a plaintiff must commence the action by filing a complaint that names a defendant. This affords the defendant the ability to file a responsive pleading, namely the answer, see Fed.R.Civ.P. 12(a), in which he can include a claim for relief against the opposing party. See Fed.R.Civ.P. 13(a), 13(b). Since section 101(a)(4)'s second proviso limits a union member's right to "institute an action," the plain language of the statutory text, when read literally, does not circumscribe a member's right to pursue a counterclaim because the assertion of a counterclaim does not "institute an action." See Illinois Bell Telephone Co., 496 F.2d at 4.
 
 B. Legislative History
 
 34
 Local 38 contends that, notwithstanding the plain language of section 101(a)(4), we should construe the second proviso broadly and prohibit interested employers from financing the counterclaims of union members so as to effectuate congressional intent. That argument is not without force. We have previously read similar language broadly to encompass counterclaims where doing so furthered the purpose of the statute in question. See Koolik v. Markowitz, 40 F.3d 567, 568-69 (2d Cir.1994). "[W]ords are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how clear the words may appear on superficial examination." Harrison v. Northern Trust Co., 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407 (1943) (internal citations and quotation marks omitted). The words chosen by Congress "are not in all instances a reliable indicator of Congress' intent, [and] we may look to the legislative history of the enactment to determine whether literal application of the statute would pervert its manifest purpose." United States v. Perdue Farms, 680 F.2d 277, 280 (2d Cir.1982) (internal citations and quotation marks omitted).
 
 
 35
 In Koolik v. Markowitz, 40 F.3d at 568, we addressed the scope of 11 U.S.C. § 362(a)(1) and held that the provision operated to stay "the commencement or continuation... of a judicial, administrative, or other action or proceeding against the debtor" where a petition in bankruptcy had been filed. 11 U.S.C. § 362(a)(1). The plaintiff in Koolik had appealed from a judgment that awarded the defendant $110,000 on his counterclaim. After the plaintiff subsequently filed a petition in bankruptcy during the course of the pending appeal, he argued that further appellate proceedings should be held in abeyance in accordance with section 362(a)(1). We agreed. On examining that provision, we noted that section 362(a)(1) had been "designed to provide the debtor with a breathing spell from his creditors." Koolik, 40 F.3d at 568 (internal citations and quotation marks omitted). We therefore construed the provision broadly to further that statutory design and read "the term `action or proceeding,' for purposes of [section] 362(a)(1), to include any pleading that asserts a claim on which relief is sought." Id. Hence, we concluded that "an answer that asserts a counterclaim against a plaintiff who becomes a bankruptcy debtor is an `action or proceeding against the debtor,' within the meaning of [section] 362(a)(1), notwithstanding the fact that the plaintiff initiated the lawsuit." Id. Section 362(a)(1) thus operated to stay the continuation of the appellate proceedings in Koolik.
 
 
 36
 The rationale that led us to construe section 362(a)(1) broadly does not apply in this instance. Construing section 101(a)(4) broadly to preclude a union member from asserting a counterclaim financed by an interested employer where the union instituted an action against the member would not further the purpose of the LMRDA.
 
 
 37
 Congress enacted the LMRDA "to correct widespread abuses of power and instances of corruption by union officials." Franza v. International Brotherhood of Teamsters, Local 671, 869 F.2d 41, 44 (2d Cir.1989). "The legislative history and the extensive hearings which preceded the enactment of the [LMRDA] abundantly evidence the intention of the Congress to prevent union officials from" abusing their disciplinary powers. Salzhandler v. Caputo, 316 F.2d 445, 449 (2d Cir.1963).
 
 
 38
 Section 101 of Title I of the LMRDA represents "[o]ne of the most significant remedial provisions of the LMRDA." International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. National Right to Work Legal Defense and Education Foundation, 590 F.2d 1139, 1149 (D.C.Cir.1978) (National Right to Work). Title I, which sets out a "Bill of Rights" for union members, was written to protect those members from the abusive or coercive practices of the union's leadership. Franza, 869 F.2d at 44. Among the rights included in section 101 of Title I "is the right of a union member to bring an action against his union and its leaders in court or before an administrative agency." National Right to Work, 590 F.2d at 1149 (citing 29 U.S.C. § 411(a)(4)). "The right-to-sue provision was designed to give union members the tools to insure the effective and fair operation of their union as a representative institution." Id.
 
 
 39
 The rights enumerated in Title I, however, are not without qualifications. The second proviso in section 101(a)(4) limits a member's right to institute an action against his union where the action is financed by an interested employer. See 29 U.S.C. § 411(a)(4).
 
 
 40
 As originally introduced by Senator McClellan in an amendment to the LMRDA, Title I did not include the second proviso. See Adamszewski, 496 F.2d at 782. Rather, the proviso "was offered in the Senate as an amendment to the right-to-sue provision of the bill of rights proposed by Senator McClellan." National Right to Work, 590 F.2d at 1149. The so-called Kuchel amendment, which did not refer to "interested" employers, initially provided:
 
 
 41
 That no employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.
 
 
 42
 105 Cong. Rec. 6693 (1959), reprinted in 2 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1220-21 (1959). That amendment, introduced by Senator Kuchel, sought "to eliminate the extremes raised by the [McClellan] amendment, and to ensure that Title I would not unduly harass and obstruct legitimate unionism." Franza, 869 F.2d at 44 (internal citations and quotation marks omitted).
 
 
 43
 Although Congress "desired to preclude potentially harmful employer involvement in union-member suits against unions," it did not want "to prevent union members from using money obtained from friends, banks, or other similar sources to finance such suits." National Right to Work, 590 F.2d at 1149-50. This concern led Congress to later add the adjective "interested" to "describe those employers or employer associations whose financing was to be prohibited." Id. at 1150; see also Adamszewski, 496 F.2d at 782-83.
 
 
 44
 The purpose of the second proviso in section 101(a)(4) was "to protect unions from harassing litigation and illegal management interference with their internal disputes with dissident workers." International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. National Right to Work Legal Defense and Education Foundation, 366 F.Supp. 46, 48 (D.D.C.1974); International Union of Operating Engineers Local 400, AFL-CIO (Hilde Construction Co.), 225 N.L.R.B. 596, 606, 1976 WL 7268 (1976), mem. aff'd, 561 F.2d 1021 (D.C.Cir.1977); see also National Right to Work, 590 F.2d at 1149 (Section 101(a)(4)'s second proviso "was designed to keep employer influence out of disputes between union members and their unions."). In essence, "Congress wanted to deny employers the power to cause harassing suits or otherwise to create divisions in the unions with which they had relationships." National Right to Work, 590 F.2d at 1151.
 
 
 45
 The concerns that section 101(a)(4)'s second proviso seeks to address have less force where, as here, a union affirmatively subjects an internal union dispute to litigation in a court of law. By taking the member to court, the union itself introduces the outside actor into what once had been an internal grievance and opens the door to some measure of interference. Moreover, to the extent that the second proviso seeks to deny interested employers the power to "cause harassing suits" or "create divisions" between the union and its members, that concern is mitigated where the union has already initiated legal action against one or more of its members. If anything, denying members the ability to secure resources from interested employers so that they can protect themselves under these circumstances — where the union invokes judicial assistance to enforce disciplinary charges and the fines that result therefrom — may leave the members vulnerable to the same abuses of union power that the LMRDA seeks to remedy.
 
 
 46
 In evaluating these considerations and their bearing on the plain statutory language before us, we must keep in mind that the text at issue here is a proviso. "It is an established rule of statutory construction that a proviso states an exception from the general policy which a law embodies, and should be strictly construed and so interpreted as not to destroy the remedial processes intended to be accomplished by the enactment." Shilkret v. Musicraft Records, 131 F.2d 929, 931 (2d Cir.1942).[5] We hold that a narrow construction of the second proviso is warranted; that narrow interpretation better comports with Title I's purpose of protecting union members from abusive union practices and, at the same time, does not undermine the intent of the second proviso.
 
 
 47
 The dissent contends that construing the second proviso in a narrow fashion undermines the goals of the LMRDA because our construction also bears on the meaning of the phrase "to institute an action" as those words are used in the main body of section 101(a)(4). According to the dissent, strictly construing the second proviso not only affects the extent to which interested employers can fund a member's counterclaim but also circumscribes the protection afforded by section 101(a)(4) to a union member's right to sue. The dissent seeks to support that conclusion by arguing that, if we read the phrase "to institute an action" as it is incorporated by reference in the second proviso in a literal manner, we must also read those same words literally when they are used in the main body of section 101(a)(4), which prohibits labor organizations from "limit[ing] the right of any member thereof to institute an action." 29 U.S.C. § 411(a)(4). Because the phrase "to institute an action," when read literally, means to commence an action through the filing of a complaint, the dissent suggests that our strict interpretation of those words would narrow the scope of the rights guaranteed by the main body of section 101(a)(4) by allowing unions to limit the rights of their members to assert a counterclaim.
 
 
 48
 However, that issue is not implicated in this appeal. In this appeal, we are asked to focus on the narrower question of whether section 101(a)(4)'s second proviso precludes a union member from pursuing a counterclaim that is financed by an interested employer. As Justice Frankfurter noted, an "exact formulation of the issue before us is necessary to avoid inadvertent pronouncement in one context when the language may require separate considerations in other settings." Automatic Canteen Co. of America v. F.T.C., 346 U.S. 61, 65, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953) (Frankfurter, J.).
 
 
 49
 Furthermore, the history of LMRDA litigation undercuts the concerns expressed by the dissent. Although the LMRDA was enacted in 1959, we are aware of no cases in which a union has argued that the text set forth in the main body of section 101(a)(4) allows a union to limit the rights of its members to assert a counterclaim. This is telling with respect to how section 101(a)(4) has been understood in the nearly 30 years since the Seventh Circuit held that the phrase "to institute an action," as those words were referred to in the second proviso, did not encompass the assertion of a counterclaim. See Illinois Bell Telephone Co., 496 F.2d at 3-4. In the decades after the Seventh Circuit arrived at that decision, there is no record of a single court holding that unions could limit the rights of their members to assert counterclaims against them in light of the terminology employed by section 101(a)(4). In essence, despite the fears expressed by the dissent, there is no persuasive evidence to suggest that parties and courts believe unions may limit the rights of their members to assert counterclaims.
 
 
 50
 For the foregoing reasons, we join the Seventh Circuit and hold that, given the plain language of section 101(a)(4)'s second proviso, "an interested employer may not finance the institution of a suit by employees, but is free to finance a defense or a counterclaim." Illinois Bell Telephone Co., 496 F.2d at 3.[6] Accordingly, we hold that the district court properly denied Local 38's motion for partial summary judgment.
 
 
 51
 III. Pelella's Inconsistent Characterizations Of His Counterclaim
 
 
 52
 After Local 38 initiated this lawsuit to recover a $4,418 fine, Pelella responded by asserting a counterclaim in which he alleged, among other things, that the union had violated his due process rights when it disciplined him without following certain procedures. When Pelella answered Local 38's complaint, he did not specify the source of those due process rights.
 
 
 53
 Local 38 eventually moved for partial summary judgment, arguing that his counterclaim was barred by section 101(a)(4) of the LMRDA. Pelella opposed the union's motion on several grounds. One in particular stands out.
 
 
 54
 In the opposition brief he filed with the district court, Pelella argued that section 101(a)(4) did not apply to his claim for relief because the counterclaim was premised on violations of the Due Process Clause, not the LMRDA. He apparently took that position in an effort to escape the reach of section 101(a)(4). Although we have never decided the issue, various courts have held that section 101(a)(4) of the LMRDA does not preclude union members from pursuing claims financed by interested employers where those claims were properly brought under statutes other than the LMRDA. See, e.g., Simo v. Union of Needletrades, Industrial & Textile Employees, Southwest District Council, 322 F.3d 602, 612 (9th Cir.), cert. denied, ___ U.S. ___, 124 S.Ct. 224, ___ L.Ed.2d ___ (2003); Adamszewski, 496 F.2d at 784-85.[7]
 
 
 55
 Despite his earlier statements denying that the LMRDA served as a basis for his counterclaim, Pelella later submitted jury instructions premised on a surprising theory of relief: violations of his due process rights under the LMRDA. A trial soon followed and the jury returned a verdict in Pelella's favor. The jury found that Local 38 had breached a contract and violated Pelella's rights under the LMRDA. It awarded Pelella $1 in nominal damages and $25,000 in punitive damages. However, the latter award rested solely on Local 38's violation of the LMRDA.
 
 
 56
 We need not decide what effect, if any, Pelella's inconsistent characterizations of his counterclaim had on the trial and verdict. First, the meager record before us does not suggest that Local 38 objected to Pelella's jury instructions. A party that "fails to object to a jury instruction at trial waives the right to make that instruction the basis for an appeal." Fogarty v. Near North Insurance Brokerage, 162 F.3d 74, 79 (2d Cir.1998).
 
 
 57
 Moreover, Local 38 did not provide us with a transcript of the trial, including those portions that relate to the jury instructions. As the appellant, Local 38 bore the burden of ordering the trial transcripts which were necessary for this appeal. See Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir.2000) (citing Fed. R.App. P. 10(b)(2)); see also Meroney v. Delta International Machinery Corp., 18 F.3d 1436, 1437 (8th Cir.1994). Local 38's failure to append the transcript prevents meaningful appellate review of the jury instructions. Cf. Wrighten, 232 F.3d at 120. We therefore decline to consider whether the LMRDA jury instructions were proper. See Harris Market Research v. Marshall Marketing and Communications, 948 F.2d 1518, 1528 (10th Cir.1991); see also King v. Unocal Corp., 58 F.3d 586, 588 (10th Cir.1995).
 
 
 58
 Finally, Local 38 does not contend, on appeal, that Pelella's initial allegations regarding the nature of the due process violations in his counterclaim warrant reversal or vacatur. By failing to raise the issue on appeal, the argument is deemed waived. ABB Industrial Systems v. Prime Technology, 120 F.3d 351, 360 n. 5 (2d Cir.1997).
 
 IV. Punitive Damages
 A. Insufficient Evidence
 
 59
 After Local 38 appealed the judgment below, the union initially argued that the jury's punitive damages award was not supported by sufficient evidence. At oral argument, the union expressly abandoned that contention. We therefore need not address that claim.
 
 B. Availability Of Punitive Damages
 
 60
 The jury awarded Pelella $1 in nominal damages and $25,000 in punitive damages. Local 38 contends that Pelella may not recover punitive damages in the absence of an award of actual damages.
 
 
 61
 In Cush-Crawford v. Adchem Corp., 271 F.3d 352, 359 (2d Cir.2001), we held that, in cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., punitive damages may be awarded regardless of whether a plaintiff also receives an award of compensatory or nominal damages. Local 38 argues that Cush-Crawford does not apply to punitive damages awarded for violations of the LMRDA. However, our decision in King v. Macri, 993 F.2d 294, 298 (2d Cir.1993), precludes Local 38 from advancing this argument on appeal.
 
 
 62
 In King, the appellants challenged a punitive damages award where the jury did not award compensatory damages. 993 F.2d at 297. Yet, at trial, the defendants failed to object when the district court told the jury that it could award punitive damages regardless of whether the plaintiff had established actual damages. Id. Therefore, we held that, to whatever extent the appellants' arguments regarding punitive damages had merit, that position "cannot be imposed to alter the award of a jury that was explicitly told, without objection, that it could make a punitive award without any compensatory award." Id. (emphasis added).
 
 
 63
 In this instance, as in King, the district court instructed the jury that it could award punitive damages even if the jury found that Pelella failed to establish actual damages. At oral argument, Local 38 conceded that the union did not object to the instruction. In the absence of such an objection, Local 38, like the appellants in King, may not seek to alter the jury award by arguing that punitive damages cannot be recovered in the absence of actual damages.
 
 C. Excessive Punitive Damages
 
 64
 "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." BMW of North America v. Gore, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Nonetheless, the Constitution places certain limits on the amount of punitive damages that may be imposed. See Cooper Industries v. Leatherman Tool Group, 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 1519-20, 155 L.Ed.2d 585 (2003). "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." Id. at 1520.
 
 
 65
 On appeal, Local 38 argues that the jury's punitive damages award violated the Due Process Clause because the award exceeded Pelella's nominal damages by a 25,000-to-1 ratio. The union raised this argument in a reply brief during the course of this appeal after the Supreme Court decided Campbell. In Campbell, the Supreme Court refused "to impose a bright-line ratio which a punitive damages award cannot exceed." Id. at 1524. However, the Court also explained that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. According to Local 38, the ratios discussed in Campbell preclude an award of punitive damages where a plaintiff recovers no actual damages and $1 in nominal damages.
 
 
 66
 As an initial observation, we note that the ratios referred to in Campbell may not apply with equal force when punitive damages are compared to nominal damages. The Campbell Court discussed significant disparities between "punitive and compensatory damages." Id. (emphasis added). However, we previously have held that those types of ratios do not necessarily control where punitive and compensatory damages are awarded but the compensatory damages are nominal in nature. Lee v. Edwards, 101 F.3d 805, 811 (2d Cir.1996); cf. Williams v. Kaufman County, 343 F.3d 689, 711 n. 75 (5th Cir.2003) (concluding that the Campbell ratios were inapposite where, among other things, the ratio at issue concerned nominal and punitive awards); Edwards v. Jewish Hospital of St. Louis, 855 F.2d 1345, 1352 (8th Cir.1988) (refusing to hold that punitive damages must bear a reasonable relationship to the amount of nominal damages since the application of "the proportionality rule to a nominal damages award would invalidate most punitive damages awards because only very low punitive damages awards could be said to bear a reasonable relationship to the amount of a nominal damages award").
 
 
 67
 Lee instructs that where compensatory damages are nominal, "a much higher ratio can be contemplated while maintaining normal respiration." 101 F.3d at 811; cf. Provost v. City of Newburgh, 262 F.3d 146, 164 (2d Cir.2001) (noting that a $10,000 punitive damages award based on a $1 nominal damages award could be deemed consistent with constitutional constraints). In Lee, we held that the use of a multiplier did not serve as the best available tool for the assessment of punitive damages where the compensatory damages were nominal. Lee, 101 F.3d at 811. Instead, we examined punitive awards in similar cases to find the appropriate limits and proportions. Id. Cf. DiSorbo v. Hoy, 343 F.3d 172, 187 (2d Cir.2003) (concluding that the use of a multiplier to assess punitive damages was not the best tool where "the jury awarded only nominal compensatory damages, yielding a staggering 650,000-to-1 ratio of punitive damages to compensatory damages").
 
 
 68
 Notwithstanding these observations, we need not decide whether the punitive damages here were grossly excessive in violation of the Due Process Clause. On the face of the record before us, Local 38 never raised this argument with the district court.[8]
 
 
 69
 Where a party contends that a punitive damages award is excessive, that issue is ripe for legal challenge after a verdict is entered. See Tronzo v. Biomet, Inc., 236 F.3d 1342, 1348-49 (Fed.Cir.2001). For that reason, excessive punitive damages that violate the Due Process Clause can be challenged through post-trial motions. See, e.g. Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 101-02 (1st Cir.2003); Zhang v. American Gem Seafoods, 339 F.3d 1020, 1042 (9th Cir.2003).
 
 
 70
 "We generally will not review a party's contention that the damages award is excessive or insufficient where the party has failed to allow the district court to rule on the matter." O'Connor v. Huard, 117 F.3d 12, 18 (1st Cir.1997); see also Rivera-Torres, 341 F.3d at 102; Total Petroleum v. Davis, 788 F.2d 476, 483 (8th Cir.1986); Carlton v. H.C. Price Co., 640 F.2d 573, 577 (5th Cir.1981). After the jury returned a verdict in Pelella's favor, Local 38 moved for judgment as a matter of law pursuant to Rule 50 and for a new trial pursuant to Rule 59. However, in those motions, the union never argued that the punitive damages award was constitutionally excessive. Local 38 therefore failed to preserve that challenge for appellate review. See Rivera-Torres, 341 F.3d at 102.
 
 
 71
 Although Local 38 bases its due process challenge on a recent Supreme Court case decided during the course of this appeal, that consideration does not lead us to a contrary conclusion. Despite the Supreme Court's references to particular ratios in Campbell, the Court also discussed applicable ratios before Local 38 instituted this lawsuit. For example, in Gore, the Court examined the disparity between punitive and compensatory damages where the punitive damages award was 500 times greater than the compensatory damages award. The Court held that, when the ratio between these awards was "a breathtaking 500 to 1, ... the [punitive damages] award must surely `raise a suspicious judicial eyebrow.'" Gore, 517 U.S. at 583, 116 S.Ct. 1589 (internal citations omitted). If anything, the 145-to-1 ratio subsequently discussed in Campbell paled in comparison. See Campbell, 123 S.Ct. at 1524.
 
 
 72
 Here, as Local 38 points out, punitive damages exceed nominal damages by 25,000 to 1. Setting aside the merits, if any, of the argument, Local 38 could unquestionably have invoked Gore in the district court proceedings to suggest that the jury's punitive award was constitutionally excessive. The Court's Campbell decision buttressed the ratios discussed in Gore but was not a necessary predicate for a due process challenge. Local 38 failed to raise such a challenge with the court below and the argument is therefore deemed waived. See Anthony v. City of New York, 339 F.3d 129, 136 n. 3 (2d Cir.2003).
 
 V. Attorney's Fees
 
 73
 After the jury returned a verdict in his favor, the district court awarded Pelella $30,213 in attorney's fees and $205.50 in costs and disbursements. On appeal, Local 38 contends that the court erred by doing so because Pelella's victory did not provide a common benefit to the union's members.
 
 
 74
 Union members who succeed in vindicating rights guaranteed them by section 101 of the LMRDA may recover attorney's fees when the effect of the attorney's services has been to benefit the union and all of its members. Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10, I.L.G.W.U., 749 F.2d 1000, 1004 (2d Cir.1984). This principle derives from Hall v. Cole, where the Supreme Court held that an award of attorney's fees to a successful plaintiff who prevails on an LMRDA claim and thereby vindicates his rights "is consistent with both the [LMRDA] and the historic equitable power of federal courts to grant such relief in the interests of justice." 412 U.S. 1, 14, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). According to the Court, the rule constitutes an extension of the "common benefit" doctrine of Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), which permits an award of attorney's fees where "the plaintiff's successful litigation confers `a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionally among them.'" Hall, 412 U.S. at 5, 93 S.Ct. 1943 (quoting Mills, 396 U.S. at 393-94, 90 S.Ct. 616).
 
 
 75
 Although the jury did not award Pelella compensatory damages and he never formally sought equitable relief to remedy the inadequate disciplinary procedures he faced, those considerations are not dispositive of whether attorney's fees are warranted under the LMRDA. A union member "need not recover compensatory damages from the union in order to be entitled to a fee award." Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers, 34 F.3d 1148, 1159 (2d Cir.1994). Nor does the absence of equitable relief preclude such an award. See Rodonich v. Senyshyn, 52 F.3d 28, 31, 33 (2d Cir.1995). Furthermore, the aggrieved member's recovery of money damages from the union does not foreclose a fee award as the damages may potentially confer substantial, albeit intangible and indirect, benefits on other union members. See id. at 33. Such damages "can serve as a check on the [union's] abuse of power and can promote the exercise of democratic rights by the rank and file." Id.
 
 
 76
 "Whether or not an LMRDA plaintiff deserves an attorney's fee award is a factual determination that rests squarely within the district court's discretion." Id. (internal citations and quotation marks omitted). The district court, rather than an appellate court, "is in a better position... to appraise the need for and potential benefits derived from the attorney's services, based on the judge's personal observation of counsel's performance and his intimate familiarity with the case." Rosario, 749 F.2d at 1004. The factual determinations of the district court are particularly important where, as here, the record on appeal offers little information about the LMRDA violations and the appellant has chosen not to append the trial transcript to the record so as to facilitate appellate review.
 
 
 77
 Here, Pelella argued that Local 38's disciplinary charges against him, and the disciplinary procedures that ensued therefrom, failed to comply with his rights to due process under the LMRDA. The jury returned a verdict in his favor on this due process counterclaim. On appeal, the union concedes, as it did below, that the charges and procedures to which Local 38 subjected Pelella reflect, at the very least, negligent compliance with the due process rights guaranteed by the LMRDA.
 
 
 78
 The district court determined that the jury's verdict against Local 38 recognized that the union's procedures and charges deprived Pelella of his due process rights. The court therefore found that Pelella's victory in the wake of his experience would result in several benefits to Local 38's membership. According to the court, a member of Local 38 faced with disciplinary charges would now receive notice of his procedural rights at a union trial. The court also thought it likely that the union would now select impartial members for its trial committees. Moreover, the court found that Pelella's vindication of his rights would prove beneficial to the members because the charges directed at him were similar to the other charges brought by the union.
 
 
 79
 We agree with the district court that these considerations justified an award of attorney's fees under the LMRDA. A district court does not abuse its discretion when the court awards attorney's fees under the LMRDA where, as here, the member's vindication of his rights "had the potential effect of deterring the union from denying members their due process procedural rights guaranteed by [section] 101 of [the] LMRDA and of encouraging union members to enforce those rights." Rosario, 749 F.2d at 1006 (emphasis added). The verdict against Local 38 confers a common benefit to its members because it will likely "increase the [union's] sensitivity to the full and fair hearing rights of its members." Bollitier v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, 735 F.Supp. 612, 622 (D.N.J.), mem. aff'd, 888 F.2d 1379 (3d Cir.1989).
 
 
 80
 In addition, where the charges of misconduct directed at Pelella were themselves inadequate, Pelella's victory will likely dispel the "chill" cast on the rights of other members who face similar inadequate charges. See Hall, 412 U.S. at 8, 93 S.Ct. 1943 ("[B]y vindicating his own right, the successful litigant dispels the `chill' cast upon the rights of others."). Hence, the district court did not abuse its discretion when the court awarded attorney's fees and costs.
 
 CONCLUSION
 
 81
 For the foregoing reasons, we affirm the orders of the district court which denied Local 38's motion for partial summary judgment, motion for judgment as a matter of law, and motion for a new trial. We also affirm the district court's decision to award Pelella attorney's fees and costs.
 
 
 82
 Costs to the defendant-appellee.
 
 
 
 Notes:
 
 
 [1]
 After the parties first asserted their respective claims, the litigation went forward before the district judge assigned to the case. In December 2000, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before a magistrate judge. At that stage, the case was assigned to the Honorable George A. Yanthis,M.J., for all further proceedings.
 
 
 [2]
 At an unidentified stage during the union's appellate proceedings, Pelella parted ways with Local 38. The lean record before us does not definitively explain why this separation came about
 According to Pelella, Local 38 directed him to work for an employer in Stamford, Connecticut, some two hours from his home in Middletown, New York. When Pelella requested relief from this assignment, Local 38's President purportedly told him that he had the option of withdrawing. However, when Pelella tried to withdraw, Local 38 allegedly terminated him from the union for refusal to accept work.
 Local 38 recalls the details of the separation somewhat differently. The union contends that it never took away Pelella's membership; to the contrary, Pelella supposedly allowed his membership to lapse when he dropped out of the apprenticeship program.
 
 
 [3]
 Section 101(a)(5) of the LMRDA provides as follows:
 No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.
 29 U.S.C. § 411(a)(5).
 
 
 [4]
 The court vacated the initial Judgment due to clerical error
 
 
 [5]
 In sharp contrast,Koolik turned on an interpretation of 11 U.S.C. § 362(a). Section 362(a) "generally must be construed broadly." Checkers Drive-In Restaurants v. Commissioner of Patents and Trademarks, 51 F.3d 1078, 1082 (D.C.Cir.1995).
 
 
 [6]
 Because we conclude that section 101(a)(4)'s second proviso does not bar counterclaims financed by interested employers, we do not decide whether an interested employer financed Pelella's counterclaim
 
 
 [7]
 We cite these cases to illustrate why Pelella initially sought to distance himself from the due process rights enumerated in the LMRDA. We do not mean to suggest that we agree, or disagree, with the manner in which these decisions construed the reach of section 101(a)(4). That issue is not before us and we decline to address it
 
 
 [8]
 By "the record," we refer informally in this instance to both the original papers and exhibits filed in the district court,see Fed. R.App. P. 10(a)(1), as well as to the information included in the joint appendix and the supplemental appendix. That record, however, is sparse. We therefore acknowledge that Local 38 may have raised an excessive punitive damages challenge with the district court during oral arguments for which we have no transcript or in documents such as briefs or letters that were not included in the record. Even assuming this is true, we, once again, have no means by which to meaningfully review arguments raised in this manner, if any, because Local 38 failed to provide us with such transcripts, briefs, or letters in an appendix. To the extent that Local 38 raised a due process challenge to the punitive damages award in the court below in materials or oral arguments outside the record, we decline to review the issue in the absence of a transcript or other documentation which would allow us meaningfully to evaluate the nature and scope of that challenge. Cf. Wrighten, 232 F.3d at 120.
 STRAUB, Circuit Judge, dissenting.
 The majority construes the phrase "to institute an action" in section 101(a)(4) of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(4), as meaning only to file a complaint, and not to assert a counterclaim. This reading has two consequences. First, under this reading, the section's second proviso does not bar counterclaims financed by interested employers. Second, this reading means that section 101(a)(4) gives a union member no protection against being disciplined by a union for asserting a counterclaim. Because I do not think that the majority's reading is compelled by the plain language of the phrase "to institute an action," and because I find the consequences of the majority's reading clearly at odds with the purposes of both the right protected by section 101(a)(4) and the second proviso, I respectfully dissent. I believe that the second proviso of section 101(a)(4) bars a union member's counterclaim that is funded by an interested employer and I would vacate and remand to the District Court for a finding as to whether Anthony Pelella's counterclaim was so financed.
 Section 101(a)(4) provides that "[n]o labor organization shall limit the right of any member thereof to institute an action in any court." Section 101(a)(4) contains two provisos, the second of which states that "no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action."
 The majority reasons that the phrase "any such action" in the second proviso refers back to the right of a member "to institute an action in any court." The majority says that although the word "action" is arguably broad enough to encompass a counterclaim, the phrase "to institute an action" means simply to file a complaint and does not include filing a counterclaim. The majority concludes that the second proviso does not prevent a member from pursuing a counterclaim funded by an interested employer because the assertion of a counterclaim does not "institute an action."
 I agree with the majority that the phrase "any such action" in the second proviso refers back to the phrase "to institute an action." Under the second proviso, an interested employer may not finance an action instituted by a union member. However, in my view, the right "to institute an action" includes the right to assert a counterclaim. If "to institute an action" includes asserting a counterclaim, then the phrase "any such action" in the second proviso refers not only to initial claims by plaintiffs but also to counterclaims. Thus, I would hold that the second proviso bars counterclaims financed by interested employers. I reach this conclusion both because I think it is consistent with the plain language of the statute, and because my reading furthers the purpose of the right protected by section 101(a)(4) and also the purposes of the second proviso.
 It bears emphasizing that the construction of the phrase "to institute an action" affects the scope of both the right protected by section 101(a)(4) and the scope of the second proviso. A narrow construction of the phrase gives a narrow scope not only to the proviso, but also to a union member's rights under the section.
 The purpose of section 101(a)(4) is to protect a union member's ability to assert his rights in court without fear of reprimand by the union. The majority says that "to institute an action" means to file a complaint — not to file a counterclaim. Thus, under the majority's reading, the first part of section 101(a)(4) says in effect: "No labor organization shall limit the right of any member thereof to file a complaint." Under this reading, section 101(a)(4) does not prevent a union from limiting the right of a member to file a counterclaim. A union could sue a member and then discipline the member for asserting a counterclaim. I view this consequence as contrary to the purpose of the right-to-sue provision. My reading of "to institute an action" protects the ability of a member to assert a counterclaim without fear of discipline. Notably, at oral argument, Pelella's counsel agreed that a union could not limit the right of a member to assert a counterclaim, a statement I find at odds with the position that counterclaims financed by interested employers are not barred by the second proviso.
 In addition, my view that the second proviso bars counterclaims financed by interested employers furthers the two purposes of the proviso: To protect unions from harassing or divisive claims caused by interested employers and to protect members from being misled or coerced by employers into filing claims against their interests.
 The majority claims that its reading is consistent with the purposes of section 101(a)(4) and its second proviso. But in fact, as I explain below, the majority's reading leaves union members vulnerable to discipline by unions and coercion by interested employers, and does not protect unions from harassing or divisive counterclaims supported by interested employers.
 I respond first to the majority's "plain meaning" argument. The majority asserts that under the plain language of the statute, "to institute an action" means only to file a complaint and does not include filing a counterclaim. The majority admits that the word "action" is arguably broad enough to encompass any type of judicial proceeding, including counterclaims. Indeed, the authority for that proposition is extensive.[1] However, the majority says that although the word "action" standing alone might include a counterclaim, the phrase as a whole — "to institute an action" — means simply to file a complaint. The majority points out that "institute" means to "begin," "commence," or "initiate by performing the first act or step." According to the majority, an action is instituted when the plaintiff files a complaint, as "that constitutes the first step invoking the judicial process." Ante at 82. In the majority's view, a defendant does not "institute" an action when he asserts a counterclaim.
 In my view, if an "action" can encompass a counterclaim, then "to institute an action" can mean to assert a counterclaim. A defendant commences or initiates a claim for relief against the plaintiff by asserting a counterclaim in the answer. Filing a counterclaim is the first step in the defendant's action against the plaintiff. I read section 101(a)(4) as protecting the right of a union member to assert a claim on which relief is sought — whether it be in an initial complaint or as a counterclaim. It is worth noting that a literal reading of section 101(a)(4) would mean that a union could not limit the right of a member to "institute" or file a claim for relief, but could discipline the member for further pursuing a claim after filing it. Surely the right-to-sue provision protects not only the initial filing of a claim but also the maintenance of a claim. Otherwise, the right protected by section 101(a)(4) would be rendered meaningless.
 As the majority has noted, in Koolik v. Markowitz, 40 F.3d 567 (2d Cir.1994) (per curiam), we read a provision that operated to stay the "commencement or continuation... of a judicial, administrative, or other action or proceeding against the debtor" upon the filing of a bankruptcy petition to stay a counterclaim asserted against the debtor. See 11 U.S.C. § 362(a)(1). According to the majority, in Koolik, a broad construction of the language furthered the purpose of the statute at issue. The majority argues that a broad construction of the language is inappropriate in the present case because it does not further the purpose of the LMRDA.
 I disagree. In my view, construing the phrase "to institute an action" to include the assertion of counterclaims furthers the purpose of the basic right guaranteed to union members by section 101(a)(4), and also the purposes of the second proviso.[2]
 The LMRDA was "Congress' first major attempt to regulate the internal affairs of labor unions," Local No. 82, Furniture and Piano Moving v. Crowley, 467 U.S. 526, 528, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984), and "was the product of congressional concern with widespread abuses of power by union leadership," Finnegan v. Leu, 456 U.S. 431, 435, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982). See also 29 U.S.C. § 401; H. REP. NO. 86-741 (1959), reprinted in 1959 U.S.C.C.A.N. 2424, 2428-29.
 The legislation that ultimately became Title I of the LMRDA — the "Bill of Rights" for union members — was introduced on the floor of the Senate by Senator McClellan. See 105 CONG. REC. 6475-76 (1959), reprinted in 2 NLRB, LEGISLATIVE HISTORY OF THE LABOR-MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959, at 1102 (1959) [hereinafter LEGISLATIVE HISTORY]; see also United Steelworkers of Am. v. Sadlowski, 457 U.S. 102, 109, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982). The Senate Committee on Labor and Public Welfare had reported out a bill containing provisions that were the forerunners of Titles II through VI of the LMRDA. Sadlowski, 457 U.S. at 109, 102 S.Ct. 2339. However, "Senator McClellan and other legislators feared that the bill did not go far enough because it did not provide general protection to union members who spoke out against the union leadership. Senator McClellan therefore proposed an amendment that he described as a `Bill of Rights' for union members." Id. (citing 105 CONG. REC. 6469-93 (1959), reprinted in 2 LEGISLATIVE HISTORY 1096-1119).
 Section 101(a)(4), entitled "[p]rotection of the right to sue," was intended to ensure that union members could assert their rights in court without interference from their unions. See 105 CONG. REC. 17,899 (1959), reprinted in 2 LEGISLATIVE HISTORY 1432 ("The basic intent and purpose of the provision was to insure the right of a union member to resort to the courts, administrative agencies, and legislatures without interference or frustration of that right by a labor organization.") (statement of Sen. John F. Kennedy); 105 CONG. REC. 6478 (1959), reprinted in 2 LEGISLATIVE HISTORY 1105 (recounting an instance where a local union leader was expelled from his union after suing an international officer and saying that "we are certainly on the right track when we guarantee to ... the present-day leaders of labor, who want to have honesty in their union, the right to sue and to bring into court the persons who are divesting them and their unions of their funds") (statement of Sen. Mundt).
 Section 101(a)(4) is written inclusively. The union cannot limit a member's right to sue "irrespective of whether or not the labor organization or its officers are named as defendants or respondents." 29 U.S.C. § 411(a)(4). Congress rejected a version of the bill that restricted the application of the provision to suits "against such labor organizations or any officer thereof." See Glasser v. Am. Fed'n of Musicians, 354 F.Supp. 1, 5 (S.D.N.Y. 1973) (citing H.R. 8342, 86th Cong. (1959), reprinted in 1 LEGISLATIVE HISTORY 698). Courts have interpreted the right-to-sue provision broadly in other contexts. See, e.g., Moore v. Local 569 of the Int'l Bhd. of Elec. Workers, 53 F.3d 1054, 1056-57 (9th Cir.1995) (holding that a fee-shifting provision in a collective bargaining agreement requiring employees to pay the attorneys' fees of the prevailing party in legal proceedings undertaken to challenge an arbitrator's decision violated section 101(a)(4), noting that the statute "is worded in the most inclusive terms, which are clearly intended to preclude restraints upon members' rights to seek relief from courts and agencies" and "we must be vigilant in assuring that union members' rights are not ground down"), cert. denied, 516 U.S. 1111, 116 S.Ct. 908, 133 L.Ed.2d 840 (1996) and 517 U.S. 1234, 116 S.Ct. 1878, 135 L.Ed.2d 174 (1996); Pawlak v. Greenawalt, 628 F.2d 826, 831 (3d Cir.1980) (holding that section 101(a)(4) prevents a union from fining a member for suing the union without first exhausting union procedures regardless of whether the member's claim concerns matters "internal" or "external" to the union), cert. denied, 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981); Phillips v. Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 118, 556 F.2d 939, 942 (9th Cir.1977) (holding that a union violates section 101(a)(4) when it sues members to punish them for their prior suit against the union, noting that "[i]f a union member's right to sue is to have any meaning, courts must be ever vigilant in protecting that right against indirect and subtle devices as well as against direct and obvious limitations"); Operating Eng'rs Local Union No. 3 v. Burroughs, 417 F.2d 370, 373 (9th Cir.1969) ("Section 411(a)(4) speaks of `an action in any court.' The word `action' is in no way limited and there is nothing in the Act which distinguishes between suits involving member as opposed to employee rights, between suits involving internal as opposed to external union problems, or between suits brought in good faith as opposed to those brought in bad faith.... [W]e do not condone the use of lawsuits for harassment purposes and do not suggest that a union would not have all of the rights which the law gives to those who are so harassed. What we do say is that the freedom to sue is precious; that the winner in a lawsuit should not have the right to discipline the loser; that the potential suitor should not be subjected to the threat of such discipline...." (footnotes omitted)), cert. denied, 397 U.S. 916, 90 S.Ct. 921, 25 L.Ed.2d 97 (1970); cf. Gilvin v. Fire, 259 F.3d 749, 760 (D.C.Cir.2001) (holding that a plaintiff's appearance in court in response to a subpoena was protected by section 101(a)(4); rejecting District Court's view that a member is protected by the provision's guarantee of the right to appear as a witness only if the member actually testifies and noting that there "is no justification for such a narrow reading of such an important element of a union member's Bill of Rights").
 Thus, construing a union member's right "to institute an action" to include the right to assert a counterclaim furthers the purpose of section 101(a)(4): To guarantee a member's right to seek relief from a court without being disciplined or otherwise frustrated by his union. Under the majority's reading of the phrase "to institute an action," section 101(a)(4) does not prevent a union from limiting a member's right to assert a counterclaim. Rather, the section prevents only a union from limiting a member's right to file a complaint. Under this reading, the right-to-sue provision permits a union to discipline a member for asserting a counterclaim when sued. In fact, a union that fears a member has a valid claim against it can sue the member preemptively and then limit the member's ability to file a counterclaim against it. This reading gives a narrow scope to the rights of union members that I find at odds with the purpose of the provision.
 As explained above, I read "to institute an action" to encompass the assertion of a counterclaim and thus read section 101(a)(4) as preventing a union from limiting a member's right to assert a counterclaim. Because I think the phrase "to institute an action" includes asserting a counterclaim, the second proviso necessarily bars counterclaims funded by interested employers — as the phrase "any such action" in the second proviso refers back to the phrase "to institute an action."
 Holding that the second proviso bars employer-supported counterclaims furthers the purposes of the proviso. It is apparent from the legislative history that Congress had two purposes in enacting the second proviso. The majority discusses the first purpose: Congress wanted to deny employers the power to put pressure on unions or create divisions in unions by encouraging suits by members. See Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Nat'l Right to Work Legal Defense and Educ. Found., Inc., 590 F.2d 1139, 1151 (D.C.Cir.1979) ("We think Congress wanted to deny employers the power to cause harassing suits or otherwise to create divisions in the unions with which they had relationships."); Adamszewski v. Local Lodge 1487, Int'l Ass'n of Machinists and Aerospace Workers, 496 F.2d 777, 783 (7th Cir.) ("In the explanation of Senator Javits, it was brought out that the word `interested' was inserted to allow a friend or bank to finance a suit but not an employer who may gain an advantage over the union from such suit. Otherwise, an employer with such an interest could bring undue pressure on the union."), cert. denied, 419 U.S. 997, 95 S.Ct. 311, 42 L.Ed.2d 271 (1974); Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Nat'l Right to Work Legal Defense and Educ. Found., Inc., 366 F.Supp. 46, 48 (D.D.C.1974) (stating that the second proviso "serves to protect unions from harassing litigation and illegal management interference with their internal disputes with dissident workers" and gives "express assurance to labor organizations that they shall be immune from `interested employer' intrusion in their judicial disputes with workers"); 105 CONG. REC. 6725 (1959), reprinted in 2 LEGISLATIVE HISTORY 1237 ("I have in mind the fact that an employer who has an interest in the litigation ought not to bring pressure upon a union. In the eventuation of a relationship of the litigant to the union, an interested employer should not be a party to finance the suit.") (statement of Sen. Javits);[3] 105 CONG. REC. A7915 (1959), reprinted in 2 LEGISLATIVE HISTORY 1811 ("The last proviso in section 101(a)(4) was added to make sure that interested employers do not take advantage of rights accorded union members by encouraging or financing harassing suits or proceedings brought by union members against their unions.") (statement of Rep. Griffin).
 The second purpose of the proviso was to protect a union member from being coerced or misled by an employer into taking action against the member's best interests. See Nat'l Right to Work, 590 F.2d at 1149 ("The debate clearly shows that the proviso was primarily `an attempt to protect a union member who may be engaged in a dispute with the (labor) organization.' Congress apparently was concerned that if employers were permitted to encourage, finance, or participate in suits by their employees against unions, they would be able, through subtle coercion or otherwise, to lead union members into action contrary to the members' desires or best interests.") (citation omitted); 105 CONG. REC. 6725 (1959), reprinted in 2 LEGISLATIVE HISTORY 1237 ("The provision is an attempt to protect a union member who may be engaged in a dispute with the organization.") (statement of Sen. Kuchel).[4]
 The majority focuses on the first purpose of the proviso — to deny employers the power to cause harassing suits or to otherwise create divisions in unions. According to the majority, these concerns have less force when the union has already initiated legal action against its member. See ante at 84. I agree that the circumstances differ to some degree when the union has itself brought a dispute to court. However, I think that an employer can disrupt or create divisions in unions by financing counterclaims by members. An employer could hinder a union's efforts to discipline members by financing the litigation of members' counterclaims against the union when the union sues to collect fines. The majority says that by taking the member to court, "the union itself introduces the outside actor into what once had been an internal grievance and opens the door to some measure of interference." Ante at 84. However, the "outside actor" to which the majority refers is the court. The proviso is concerned about a different outside actor — the employer. Permitting an interested employer to fund counterclaims has the potential to cause the type of harm that the proviso sought to avoid.
 In addition, in enacting the second proviso, Congress was concerned about an interested employer misleading or coercing a union member into taking action against his best interests. This concern applies with respect to counterclaims. Under certain circumstances, a union member may be better off simply defending against a union's claims, but an interested employer in an attempt to further its own interests could mislead or coerce a member into asserting a counterclaim.
 The majority reasons that "denying members the ability to secure resources from interested employers so that they can protect themselves under these circumstances — where the union invokes judicial assistance to enforce disciplinary charges and the fines that result therefrom — may leave the members vulnerable to the same abuses of union power that the LMRDA seeks to remedy." Ante at 85. The majority points to the rule of statutory construction "that a proviso states an exception from the general policy which a law embodies, and should be strictly construed and so interpreted as not to destroy the remedial processes intended to be accomplished by the enactment." Ante at 85 (quoting Shilkret v. Musicraft Records, 131 F.2d 929, 931 (2d Cir.1942) (internal quotation marks omitted)). According to the majority, a "narrow interpretation" of the proviso "better comports with Title I's purpose of protecting union members from abusive union practices." Ante at 85.
 I do not think that the rule of statutory interpretation to which the majority refers — that provisos should be strictly construed — applies here because the scope of both the basic right protected by section 101(a)(4) and the second proviso turn on the meaning of the phrase "to institute an action." Construing the phrase narrowly gives a narrow scope to the second proviso, but also gives a narrow scope to the rights of union members under section 101(a)(4). Although the majority expresses concern that construing the second proviso to bar employer-supported counterclaims will leave union members vulnerable to abuses of union power, reading the right-to-sue provision to give no protection to a member's ability to assert a counterclaim leaves members more vulnerable to abusive union practices then they would be under my reading of section 101(a)(4) and its second proviso. My reading protects union members from discipline by unions for asserting counterclaims and from being misled or coerced by interested employers. Furthermore, under my reading, unions are protected from harassing and divisive counterclaims financed by interested employers.
 The majority, responding to my dissent, argues that we are asked in this appeal to construe only the second proviso and the effect of our interpretation on the right protected by the main body of section 101(a)(4) should not be considered. See ante at 85. However, I am engaging in simple statutory interpretation — not hypothetical analysis. Our task is to construe the meaning of the second proviso. The meaning of the proviso depends on the meaning of the phrase "any such action," which appears in that proviso. The majority and I agree that the phrase "any such action" refers back to the phrase "to institute an action," which appears in the main body of section 101(a)(4). To determine what Congress meant when it said "to institute an action," I look at the impact of various constructions on the meaning of the main body of section 101(a)(4), which is where the phrase actually appears in the statute.
 In the majority's view, the phrase "to institute an action" does not encompass the filing of a counterclaim. Based in part on my belief that Congress did not intend section 101(a)(4) to give no protection to a member's right to file a counterclaim, I conclude that Congress did not intend the phrase "to institute an action" to have the meaning the majority gives it. The words "to institute an action," which the majority holds do not encompass the filing of a counterclaim, could not somehow have a different meaning when we consider the meaning of the main body of section 101(a)(4). This is not even a case where a phrase appears twice in a statute and we would presume ordinarily that the phrase has the same meaning in both places. Rather, here we are discussing the meaning of the same words in the same place in the statute. The majority has given those words a certain meaning and cannot suggest that the words do not retain that meaning when the scope of members' rights under the main body of section 101(a)(4) is considered.
 The majority's reading of the phrase "to institute an action" leads to a meaning of the main body of section 101(a)(4) — and of the second proviso — that I do not think Congress intended. I believe that my reading of the phrase, to include the assertion of counterclaims, better comports with Congressional intent.
 In sum, I think that section 101(a)(4)'s guarantee of a union member's right to sue extends to the right to assert a counterclaim, and that counterclaims which are supported by interested employers are barred by the second proviso. Thus, I would vacate and remand to the District Court for a finding as to whether Anthony Pelella's counterclaim indeed was financed by an interested employer.
 Notes:
 
 
 [1]
 Support comes not only fromKoolik v. Markowitz, 40 F.3d 567 (2d Cir.1994) (per curiam), which the majority discusses, but from other cases as well. Courts have read an attorneys' fees provision of the Employee Retirement Income Security Act that states that fees are to be awarded in "any action" by a fiduciary for or on behalf of a plan in which a judgment in favor of the plan is awarded to mandate payment of fees to a pension fund that prevails on a counterclaim. See 29 U.S.C. § 1132(g)(2) ("In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan.... (D) reasonable attorney's fees and costs of the action, to be paid by the defendant ...."); Malden Mills Indus., Inc. v. ILGWU Nat'l Ret. Fund, 766 F.Supp. 1202, 1218 (D.Mass.1991) ("Although the literal wording of section 1132(g)(2) refers to an `action' by a fiduciary, various courts have interpreted this to include a counterclaim by a pension fund for withdrawal liability or delinquent contributions under section 1145."); see also Penn Elastic Co. v. United Retail and Wholesale Employees Union, Local 115 Joint Pension Fund, 792 F.2d 45, 48 (3d Cir.1986).
 In addition, counterclaims are often treated like claims asserted by the plaintiff in the original action. Counterclaims for affirmative relief are generally subject to applicable statutes of limitation. See, e.g., Hurst v. U.S. Dep't of Educ., 901 F.2d 836, 837 (10th Cir.1990) ("It is fairly well established ... that a counterclaim for affirmative relief ... is subject to the operation of pertinent statutes of limitation."). A court may enter a separate, final judgment on any counterclaim after making an express determination that there is no just reason for delay. See Fed.R.Civ.P. 54(b); Reiter v. Cooper, 507 U.S. 258, 265, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) ("A defense cannot possibly be adjudicated separately from the plaintiff's claim to which it applies; a counterclaim can be. Federal Rule of Civil Procedure 54(b) permits a district court to enter separate final judgment on any claim or counterclaim, after making `an express determination that there is no just reason for delay.'" (citation omitted)). Finally, a court may sever counterclaims for separate trial in furtherance of judicial convenience, to avoid prejudice, or when separate trials will be conducive to expedition and economy. See Fed.R.Civ.P. 13(i) & 42(b); Sound Video Unlimited., Inc. v. Video Shack Inc., 700 F.Supp. 127, 146 (S.D.N.Y. 1988).
 
 
 [2]
 "Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well."United States v. Gayle, 342 F.3d 89, 92 (2d Cir.2003). However, "[t]o resolve ... textual ambiguity, we may consult legislative history and other tools of statutory construction to discern Congress's meaning." Id. at 93; see also Disabled in Action of Metro. N.Y. v. Hammons, 202 F.3d 110, 124 (2d Cir.2000) ("We focus on the most authoritative and reliable materials of legislative history, including: the conference committee report, committee reports, sponsor/floor manager statement and floor and hearing colloquy.").
 
 
 [3]
 Senator Javits suggested adding the word "interested" before "employer" in the second provisoSee 105 CONG. REC. 6725 (1959), reprinted in 2 LEGISLATIVE HISTORY 1237.
 
 
 [4]
 Senator Kuchel introduced an amendment which added a version of the second proviso to section 101(a)(4)See 105 CONG. REC. 6693 (1959), reprinted in 2 LEGISLATIVE HISTORY 1220-21. Senator Kuchel's version was identical to the proviso enacted except that it did not contain the word "interested" before "employer."